Kiernan agt. Manhattan Quotation Telegraph Co.

## SUPREME COURT.

JOHN J. KIERNAN agt. THE MANHATTAN QUOTATION TELEGRAPH
COMPANY and FRANCIS A. ABBOT.

*Right of property in news — transmission by telegraph.*

News is property. Its transmission to subscribers over telegraphic print-
ing instruments s not a general publication.

*New York, Special Term, January,* 1876.

*Buckham, Smales & Walker,* attorneys for plaintiff.

*Stephen A. Walker & Grosvenor P. Lowery,* of counsel.

*C. T. Polhemus,* attorney for defendant Manhattan Quota-
tion Company.

*William Stanley,* of counsel

VAN BRUNT, *J.* — The questions to be determined in the
decision of this case are three in number :

First. Had the plaintiff any right of property in the foreign
financial news obtained by him from the Associated Press
Corporation, and transmitted by him to his customers ?

Second. Has the defendant, the Manhattan Quotation
Telegraph Company, made use of this news by transmitting
it over the wires to its customers ?

Third. If the plaintiff had a right of property in the news
received by him from the Associated Press, did he abandon
such right when he transmitted the news to his customers ?

The Associated Press is a corporation which has for its
business the collection of news in all parts of the world by

its agents, and which is transmitted to the city of New York for the use of its members. Among the many classes of intelligence thus transmitted from Europe is what is called " foreign financial news," consisting of quotations of consols, rentes, U. S. bonds, railroad stocks, the rates of interest, and increase and decrease of the specie in the banks of England and France.

The Gold and Stock Telegraph Company is a corporation formed for the purpose of transmitting to its customers, by telegraph, " foreign financial news," and also " domestic financial news," including the quotations of the Stock Exchange.

The plaintiff was engaged in furnishing to his customers, by telegraph, " foreign financial news." The defendant, " The Manhattan Quotation Telegraph Company," was also engaged in the business of furnishing to its customers both foreign and domestic financial news ; and the defendant Abbot was its agent for procuring of the same.

The Gold and Stock Telegraph Company had a contract or agreement by which it had the exclusive use of all " foreign financial news " for the space of thirty minutes after its receipt by the Associated Press in this city.

On the 10th of January, 1873, the Gold and Stock Telegraph Company made a contract with the plaintiff, by which they gave to him the exclusive use of all " foreign financial news " received from the Associated Press for the space of fifteen minutes after its receipt by them. The manner in which this business is conducted is as follows:

Any news, collected by the agents of the Associated Press abroad is telegraphed by cable to the Associated Press, the message being in cypher. The message is then translated by an employe of the Associated Press, and such part as comes under the head of foreign financial news is handed over to the Gold and Stock Telegraph Company, who send it at once by a Morse wire to the office of Mr. Kiernan ; it is then sent back by Mr. Kiernan to the Gold and Stock Telegraph Com-

pany, with instructions to transmit it to his subscribers, which is immediately done.

The messages thus sent are received by Mr. Kiernan's subscribers in from one to three minutes after their receipt by the Gold and Stock Telegraph Company from the Associated Press.

If the Associated Press have any right of property in the new stransmitted to it by telegraph by its agents abroad, then clearly the plaintiff has succeeded to such right, as far as relates to "foreign financial news," for the space of at least fifteen minutes after its receipt from the Associated Press by the Gold and Stock Telegraph Company.

It is claimed by the defendants that no such right of property exists in news, upon the ground that before this intelligence was gathered together by the agents of the Associated Press in Europe, it was public property and open to all the world, and that it was not made the exclusive property of the Associated Press because it had been collected and telegraphed to them by its agents. That before it was gathered the first comer had a perfect right to have this news and publish it.

It may be perfectly true that no person could be restrained from the publication of this news in Europe, but it is difficult to see how such a right can be extended so far as to authorize the publication of news which has been collected by the agents of the Associated Press, and telegraphed to them at great expense without its consent.

It would be an atrocious doctrine to hold that dispatches, the result of the diligence and expenditure of one man, could with impunity be pilfered and published by another.

It is undoubtedly true that in respect to news, its publication cannot be interfered with where the party procures the intelligence by the diligence of his own agents; but if he seeks to profit by the superior diligence of his rivals, it is unjust that he should be allowed to do so until the right of property has been abandoned by publication.

The mere fact that a certain class of information is open to all that seek it, is no answer to a claim to a right of property in such information made by a person who, at his own expense and by his own labor, has collected it.

*V. C.* Wood, in *Kelly* agt. *Morris* (1 *Law Rep.* [*Eq.*], 697), a case between publishers of rival business directories, says : " The defendant has been most completely mistaken in what he assumes to be his right to deal with the labor and property of others. In the case of a dictionary, map, guide-book or directory, when there are certain objects of information which must, if described correctly, be described in the same words, a subsequent compiler is bound to set about doing for himself that which the first compiler has done. In the case of a roads-book, he must count the milestones for himself. In the case of a map of a newly discovered island, he must go through the whole process of triangulation just as if he had never seen any former map. No doubt the expense of procuring the information in a legitimate way is very great. But the defendant goes on in his affidavit to propound a most extraordinary doctrine as to the right of publicity in the names of private residents, who had, as he expressed it, given their names for public use. What he has done has been just to copy the plaintiff's book, and then send out canvassers to see if the information, so copied, was correct. If the canvassers did not find the occupant of the house at home or could get no answer from him, then the information copied from the plaintiff's book was reprinted bodily, as if it was a question for the occupier of the house only, and not for the compiler of the previous directory."

*V. C.* Malins, in *Cox* agt. *Land and Water Journal Company* (9 *Law R.* [*Eq.*], 322), a case respecting a list of hounds, says : " It is clear that, in this case, the getting the names of masters of hunts, the number of hounds, the huntsmen and whips, and so forth, is information open to all who seek to obtain it ; but they must get it at their own expense,

Kiernan agt. Manhattan Quotation Telegraph Co.

as the result of their own labor, and they are not to be entitled to the results of the labors undergone by others."

These cases clearly sustain the doctrine that a man may impress upon materials, which are open to all the world, a right of property when he has, as the result of his own efforts and expenditure, collected and reduced to a form serviceable to the public such material.

This right of property, however, does not preclude another person, as the result of his own efforts and diligence, from collecting independently, and utilizing as he may see fit, the same materials.

Applying this principle to the case of the Associated Press, it is clear that it has a right of property in all news transmitted to it by its agents, until it abandons that right by publication. The agents of the Associated Press abroad, it is true, only do that which any other person could do if they felt so disposed; but the collection of news being the result of their own labor, and its value as news being impressed upon it by the fact of such collection, and by the fact of its being telegraphed by cable at great expense, clearly bring such dispatches within the principles of the cases cited.

To say that the Associated Press could not restrain the publication of its dispatches by any person who should surreptitiously obtain them would be to hold that no private individual could prevent the publication of his own private dispatches if they should happen to relate to public events.

It seems to me clear, therefore, that there is a right of property which will be protected by the court, in the news collected by the Associated Press abroad and telegraphed to it by its agents, so long as that right is not abandoned by publication; and as Mr. Kiernan has succeeded to the rights of the Associated Press, as far as relates to "foreign financial news," he is entitled to protection in the use of that news, unless he abandons it by publication.

The next question to be considered is, has the defendant, the Manhattan Quotation Telegraph Company, made use of

news belonging to the plaintiff, by transmitting it over its wires to its customers.

It appears, by the undisputed evidence in the case, that, at least up to the time of the commencement of this action, the Manhattan Quotation Telegraph Company obtained all its foreign financial news through the defendant Francis A. Abbot, who was its agent. There was no evidence produced before me that Abbot had any means of information whatever, except such as he derived from the inspection of the tapes of Mr. Kiernan, and those of the Gold and Stock Telegraph Company, and of the manifold slips of Mr. Kiernan in the offices of their customers. It was affirmatively shown by the plaintiff that, in more than one instance, Mr. Abbot had been seen copying dispatches from Mr. Kiernan's instruments or manifold slips, and which almost immediately appeared upon the tapes of the defendant's company. We also find that, on more than one occasion, the same errors were committed by the Manhattan Company as had been committed by Mr. Kiernan but a moment before.

In one instance, we find a dispatch appearing upon the tapes of the Manhattan Company, purporting to be a special message from London, which had its entire origin in the manifold slip hung up by Mr. Kiernan in the rooms of the Gold Board.

It is shown, by the testimony of Mr. Abbot, that he did procure his dispatches from the customers of Mr. Kiernan; and that although he pretended that he obtained information through bankers in the city of New York, no evidence, upon the trial of this case, was produced that Mr. Abbot had, in a single instance, obtained a particle of "foreign financial news" from such a source; and the conclusion is irresistible that the great bulk of such information he obtained from the tapes of Mr. Kiernan's machine, or from his manifold slips sent to his customers.

On behalf of the Manhattan Quotation Telegraph Company, it is claimed that although Mr. Abbot may have ille-

gitimately and wrongfully obtained the news which he furnished to them, that they being ignorant of these facts are not to be held liable for the wrongful acts of their agent.

It is undoubtedly true, generally, that a principal is not liable for the wrongful acts of his agents; but the principal cannot avail himself and knowingly profit by the wrongful acts of his agent without being liable therefor. The Manhattan Company seem to have acted toward its agent, Abbot, in precisely the same way as Abbot acted toward his man, Bowen.

Bowen, according to Abbot's testimony, was accustomed to go out and get for Abbot foreign financial news, which Abbot furnished to the Manhattan Company; but Abbot took particular care never to inquire from Bowen where he got his news from; and so, the Manhattan Company, although frequently informed that Abbot had no sources of his own of information as to foreign financial news, used the news furnished by him without ever thinking it necessary to make any investigation of the subject.

It would appear as though, as long as they got the news, the less they knew about the source from which it came the better they were pleased.

It is no defense to a principal, when sought to be charged for the wrongful acts of his agent, the profits of which he has reaped, to say that he did not know of such wrongful acts, when it appears that he had been informed that such acts were wrongful, and has neglected to make any investigation as to the truth of the allegation.

Having now determined that the plaintiff had a right of property in his foreign financial news, and that the Manhattan Company has made use of such news, the only remaining question to be considered is : Does the plaintiff abandon such right by transmitting such news to his customers ? If such transmission amounts to a general publication then it is clear that all rights of the plaintiff are lost. It is not necessary that I should here discuss the question as to the right of the

court to protect such right of property. It is a question which has been decided by our highest court, and must be considered as the settled law of this state.

It has been held that the representation of a drama upon the stage is not such a publication as deprives the author of his right of property therein. The delivery of a lecture to a public audience, or the preaching of a sermon by a minister to his congregation, does not work a forfeiture of the common-law right of property in the lecture or sermon. The cases seem to recognize a distinction between a general and unrestricted publication, which works a forfeiture of this right, and a qualified or limited publication, which has no such result (*Miller* agt. *Taylor*, 4 *Burrows*, 304; *Woolsey* agt. *Judd*, 4 *Duer*, 485; *Palmer* agt. *De Witt*, 47 *N. Y.*, 532).

It is the unquestioned law of this state, that in the case of letters the general property, and the general rights incident to property, belong to the writer; and the person to whom letters are addressed has but a limited right, or special property, in such letters, as a trustee or bailee for particular purposes, either of information or of protection, or of support of his rights and character; and the publication of letters, even by the receiver, has been restrained where such publication was not made for purposes of protection, or of support of his rights or character (*Woolsey* agt. *Judd, supra ; Folsom* agt. *Marsh*, 2 *Stcry*, 100).

Applying this principle to the case now under discussion, it is evident that if Mr. Kiernan transmitted his foreign financial news to his customers, for their information, by means of manifold slips exclusively, he could restrain the publication by these persons of such intelligence. Is there any difference in principle because he writes to his customers by telegraph ? I am unable to see any distinction.

The telegraph is simply a means which modern science has adapted to the purposes of communication between persons at a distance from each other. And I am unable to see that

it makes any difference in the principle governing written communications whether Mr. Kiernan, sitting in his office, by means of the telegraph writes his communication upon paper in the office of the customer; or whether he writes the communication in his own office and then sends it to his customers.

It was claimed, upon the trial of this cause, that Mr. Kiernan having placed his machines in the office of his customers, without restricting their use of the information which he conveys to them by means of said machines, cannot restrain their making any use of it which they may wish.

It seems to me that this proposition cannot be sustained, because, although there may not have been any distinct restriction placed by Mr. Kiernan upon the customer's use of the information conveyed to him, yet it is evident that the customer must have understood, from the very nature of the transaction, that he had no right to use or publish the said information, except in connection with his own business.

That there may be such a tacit understanding implied from the nature of the contract is expressly held in the case of *Turner* agt. *Robinson* (10 *Irish Ch. R.*, 134).

The court in that case used the following language : " It is, secondly, insisted, by the counsel for the respondent Robinson, that the exhibition of the painting by Mr. Wallis, at the Royal Academy, was a publication of the painting itself. I inquired, during the course of my argument, whether there were any rules or by-laws of the Royal Academy preventing the taking of any copy or sketch from the paintings exhibited, as, of course, if there were such rules or by-laws, the exhibition of a painting on the faith of such regulation would not be a publication so as to deprive a painter of his common-law right. It would, in such case, be a clear breach of trust and confidence on the part of the member of the Royal Academy to permit copies or sketches to be taken, when it is to be assumed that paintings are sent to the Royal

Academy on the faith of such regulations; and the public who are permitted, on payment of a small sum, to visit the exhibition of paintings at the Royal Academy, must visit the exhibition subject to such rules and regulations, and can have no rights which the members of the Royal Academy have not."

And again, the court says: "If there was no statute protecting copyright in literary works, and Sir Walter Scott had read out 'Waverly' to a large party of friends, it is idle to say that such would have amounted to publication so as to have deprived him of his common-law right; and the painter, or the owner of the painting, who exhibits it at such exhibitions as those of London, Dublin, or Manchester, and having regard to the object of such exhibitions, should be considered as only allowing it to be viewed by the public on a tacit understanding that an improper advantage would not be taken of the privilege thus granted; and I am disposed to think, without reference to the letters I have read, that such an exhibition would not be a publication so as to deprive a painter, or the owner of a painting, of his common-law right."

It would, therefore, seem that the transmission by Mr. Kiernan of his foreign financial news to his customers was but a qualified publication, which did not forfeit his right of property therein.

The plaintiff is, therefore, entitled to judgment restraining them from the publication of the foreign financial reports of the plaintiff.