THE NEW YORK AND CHICAGO GRAIN AND STOCK EX-
CHANGE

V.

THE BOARD OF TRADE OF THE CITY OF CHICAGO
ET AL.

*Board of Trade of City of Chicago—Market Quotations—Control of—
Injunction.*

1. The charter of the Board of Trade of the City of Chicago imposes upon that body no duty of a public nature. The individual business of each of its members is private, and their aggregate business is of like character.

2. There can be no public policy controlling any course of business unless some public interest will be affected by the failure of such control.

3. The Board of Trade of the City of Chicago, may collect the market quotations on the floor of its exchange, send them to the telegraph companies as its private dispatches to persons named as its correspondents and prohibit such companies from transmitting them to any person except those so designated.

4. A person who is not a member of the board, but has been on its list of correspondents. is not entitled to an injunction to prevent the removal of the "ticker" from his office, and to compel the board to continue to furnish him its market quotations.

[Opinion filed July 19, 1888.]

IN ERROR to the Circuit Court of Cook County; the Hon.
LORIN C. COLLINS, Judge, presiding.

Prior to August 29, 1883, the Board of Trade of the City of Chicago, permitted the agents of the Western Union Telegraph Company and other telegraph companies to have access to the floor of its exchange room for the purpose of collecting the market quotations of grain, provisions, etc. Wires were connected with the exchange room and the quotations thus secured were sent therefrom by the operators of the telegraph companies to all their customers who were willing to pay for the service. Several years before the date named, the telegraphic instrument known as the "ticker" was brought into

94 APPELLATE COURTS OF ILLINOIS.

VOL. 27.] N.Y. & Chi. Grain & Stock Exch. v. Chi. Bd. of Trade.

use, its advantages being that it automatically registered the quotations in print, and could be placed in the office of each customer and connected with the wire at the exchange, so that each fluctuation in the market might be instantaneously transmitted to every customer having one of these instruments. The Gold and Stock Telegraph Company, having acquired a monopoly of the "ticker," it made some arrangement with the Western Union Telegraph Company, by which the latter at the time this suit was commenced and for some time previous, had control thereof. One of the instruments was placed in the office of the plaintiff in error and was in use by it when the suit was commenced.

On August 29, 1883, the Board of Trade adopted new rules, one of which ordered that its board of directors should provide a corps of market reporters to ascertain the current market price of commodities dealt in by the members of the board, and all changes that might occur in the same from time to time; that such reports should be frequently communicated by telegraph to such correspondents as might be willing to pay necessary charges for compiling and transmitting them under such regulations as the directors might make with any telegraph company; that the forwarding of such reports to any firm, individual or corporation should be only on condition that it was an accommodation service to be performed at the pleasure of the board and discontinued with or without notice.

About the time this rule was adopted the agents of the telegraph companies were excluded from the floor of the exchange, and the board, by its employes, took charge of the telegraphic instruments and wires on the floor of the exchange and the collection of the market reports and the forwarding of the same from the floor to the companies, the latter being prohibited from sending the quotations to any person-firm or corporation except such as the board should approve.

About December 1, 1884, a new plan was adopted. The board then made arrangement with the companies that it would telegraph to them every morning the names of all the correspondents, and through the day would send from the ex-

change the fluctuations in the market collected by its employes, which the companies were immediately to telegraph to each of the correspondents and none other; at the close of the quotations the name of the Board of Trade was to be sent by telegraph, so that the day's dispatch, though sent in fragments, was to be treated and considered as a continuous private dispatch from the board to each of said correspondents. The companies were to pay the board for the information thus collected and furnished the sum of $750 per month, while the collection of the news cost the board about $10,000 a year. The companies collected from the correspondents such compensation as they agreed upon, the Board of Trade having nothing whatever to do with the same.

Shortly before this suit was commenced, the board struck from its list of correspondents the name of the plaintiff in error, and the companies threatened to remove the ticker from their office, and to sever their telegraphic connection. The bill in this case was filed to prevent the execution of that threat and to compel the defendants in error to continue to furnish such information to the plaintiff in error, it being ready and willing to pay therefor, and to comply with all reasonable rules and regulations in regard to the same, and to declare void the contract which prohibited the companies from sending the quotations to others than those designated by the Board of Trade.

A preliminary injunction was granted, but on the final hearing was dissolved and the bill was dismissed for want of equity. The New York & Chicago Grain and Stock Exchange sued out this writ of error to reverse that order.

Messrs. BISBEE, AHRENS & DECKER, for plaintiff in error.

The question is squarely presented whether, under any circumstances, the defendant corporation can be prevented from monopolizing the information as to the changes and fluctuations of the market of the Board of Trade of Chicago, or, otherwise stated, whether they can be required, if they disseminate this information to some for a consideration, to treat all alike.

96 APPELLATE COURTS OF ILLINOIS.

VOL. 27.] N.Y. & Chi. Grain & Stock Exch. v. Chi. Bd. of Trade.

We contend that the franchises of the Board of Trade have for a term of years been so exercised, and the course of business among its members has been such, that there has resulted a standard market for agricultural products, and that the methods adopted for indicating that market and collecting news and information in relation to its fluctuations to be sent abroad for the use of merchants, have been such as to create a property value in such market news and information, and that the market news and information, and the market itself and all the appliances used in the course of business by which such market results, and by which such market information is created and transmitted, are affected with a public interest, so that the Board of Trade itself can not discriminate as to the parties who shall receive the same.

We contend that the same principle applies to the market information as collected and transmitted independent of its relations to the exchange hall or other business appliances of the Board of Trade, or to the rights and privileges of the members of the Board of Trade. In other words, a species of property has been created—by the creation of the market and the collection of the information relating to that market, and the practice of disseminating such information—in the market news, and information so collected and disseminated, which property is so affected with a public interest that it can not be used for purposes of monopoly or discrimination. Kiernan v. Manhattan Co., 50 How. Pr. 194.

We contend that whatever view may be taken of the rights of the Board of Trade to monopolize its market and market information to its membership while in the transaction of their business on the floor of exchange, it can not, by contract or otherwise, clothe the information in regard to such market, when placed in the hands of the telegraph companies, with any limitation; that the market news or information, when transmitted to the telegraph companies, is of a public nature, and the telegraph company can not use its franchises in the protection of such a monopoly.

We contend that the methods adopted by the appellees, although intended to avoid the law and to transform the mes-

sages over the circuits of the telegraph company into private messages, failed to accomplish the intended result.

Underlying our first position, and more or less entering into the others, is the doctrine of Hale in his *De Portibus Maris* to the effect that whenever private property of whatever kind is used in such a manner as that the public interest is affected by it, then reflexively the property or franchise, or whatever it may be, is also affected with a public interest and ceases to be *juris privati*.

The application of the doctrine that both the court and the Legislature may regulate with reference to private property affected with public use, so as to prevent discrimination, monopoly, or injury to the public welfare, has in recent years, by the activity of scientific investigation and the wonderful progress in the mechanical art, been largely extended, and by numerous recent decisions the courts have taken almost uniformly the position that this doctrine ought to be applied to all changes and to all conditions, however new, if the public welfare requires its application. Munn v. Illinois, 94 U. S. 113; Hocton v. State, 105 Ind. 250.

The common carrier is regulated because its property is affected with the public use just as a wharfinger or warehousemen are made subjects of both judicial and legislative control. No matter what the business may be called, the principle in every case is this: that no man can so use his property or his rights as to make it a matter of public interest that there should be no discrimination or monopoly whereby one person or corporation should be favored above another person or corporation, without submitting himself to the control of both the Legislature and, in the absence of legislation, to the jurisdiction of the proper court, to prevent such monopoly or discrimination, and to prevent any use of such property or such franchise as would be prejudicial to public interest. State v. Nebraska Telephone Co., 17 Neb. 126; Pensacola Telegraph Co. v. W. U. Telegraph Co., 96 U. S. 9; State v. The Bell Telephone Co. and others, 36 Ohio St. 296; State of Missouri v. Bell Telephone Co., 23 Fed. Rep. 239; The American Rapid

98 APPELLATE COURTS OF ILLINOIS.

VOL. 27.] N.Y. & Chi. Grain & Stock Exch. v. Chi. Bd. of Trade.

Telegraph Co. v. The Connecticut Telephone Co., 44 Am. Rep. 237.

An examination of the sources of the doctrine which alleges that the courts may interfere and prevent monopoly and unjust discrimination in the use of private property under certain circumstances, will show very clearly that the real question is, has a person or corporation so used his or its property that the public welfare requires that there should be no discrimination? It was and is always a question of monopoly. Monopolies have always been abhorred by the law; they are against the best interests of the commonwealth. Wherever a monopoly would be injurious to the public interest there is found a case where property or franchise has become affected with a public interest. That is what is meant by saying that property has become affected with a public interest. No matter what a man's business may be, if he pursue such a course of business and gather around him circumstances and bearings until the manner in which he treats his customers has become a matter of public welfare, until it is within his power to monopolize his business to the prejudice of the public interest, then, and always under such circumstances, the property and appliances and results of such business are within the principle. Allnutt v. Inglis, 12 East, 527.

The doctrine we contend for has nothing whatever to do with corporations as such. The question whether the corporation is a public or private corporation in the sense implied in that opinion, has not the remotest relation to the question under consideration. It is simply a question whether in this case the appellees have so used their property, so conducted their business, that by allowing them to discriminate they can enforce a monopoly to the injury of the public. No matter what the nature of their corporation may be, no matter what the nature of their business, it comes back to this question of public interest, as in the case of ferries, wharves, warehouses, elevators and telephones. On this basis alone we have proposed to discuss this case, and we contend that if we can show upon the facts in this case, either that the Board of Trade has so conducted its business with reference to the pub-

lic, that market information has become a public interest, or
that the telegraph companies have so conducted their busi-
ness in collecting the market information or transmitting it for
the use of the public that by now becoming a party to dis-
crimination in reference to persons and corporations desiring
such information, a monopoly injurious to the public welfare
would be created, we establish thereby that the appellees are
entitled to the injunction prayed for in their bill, and that it
was error in the court below to dismiss appellee's bill for want
of equity. The general rule in regard to all such corpora-
tions is, that they can not discriminate against anybody. To
allow them to discriminate between persons would be to open
the door to the establishment of monopolies more dangerous
than any that have heretofore threatened the welfare of the
people. If these companies can discriminate under any cir-
cumstance or pretense whatever, between persons in the com-
munity, they may enrich some and impoverish others. Re-
lieve them from the force of this salutary rule and they would
soon exercise a power which would be adequate to almost any
purpose of oppression. Therefore all contracts or stipulations,
whatever may be their form, and all understandings, shifts
and devices that may be adopted to justify or protect or cover
such an exercise of authority, should be construed by the court
as void, being against public policy. Horner v. Nevens, 7
Bing. 743; Craft v. McConough, 79 Ill. 346.

Mr. SIDNEY SMITH, for the Board of Trade of the City of
Chicago, defendant in error.

The question, and the only question presented by this case,
is this: Has the Board of Trade of the City of Chicago the
right to determine what telegraphic dispatches it will send
directly from its hall of exchange during business hours and to
whom it shall send them; or, whether it will send any dis-
patches whatever? In other words, whether this corporation,
which is purely a mercantile association, has the power to con-
trol its own private dispatches relating to the private business
of its members. The Board of Trade of the City of Chicago
existed as a voluntary, unincorporated association for years be-
fore it became incorporated; and it was incorporated, not for

100    APPELLATE COURTS OF ILLINOIS.

VOL. 27.]    N.Y. & Chi. Grain & Stock Exch. v. Chi. Bd. of Trade.

the purpose of conducting business as a corporation, but merely for the purpose of affording better facilities to the members in the conduct of their private business, and in their dealings with each other. It is safe to assert that this is strictly a private corporation, and that both the individual and aggregate business of its members is as essentially private business, since, as before, its incorporation. Courts have held that telegraph companies chartered for the purpose of conducting the business of transmitting news or information with powers of eminent domain, etc., are. so to speak, common carriers of news or information, and, therefore, are bound to serve all alike who choose to employ them, not in gathering information, but transmitting to such party as the employer shall name, such information as he himself may desire. The Chicago Board of Trade is neither a news gatherer nor a news carrier for the public. Such a business, if assumed, would be outside of the objects for which it is incorporated. It can not, therefore, be chargeable with the duty either of collecting or transmitting market reports or news to any or all, not members of the association, who may choose to employ it in such service. And so the Circuit Courts of the United States have held. Pub. Grain & Stock Ex. v. Board of Trade, 15 Fed. Rep. 847; Marine Grain & Stock Ex. v. Same, 22 Fed. Rep. 23; Bryant v. W. U. Tel. Co., 17 Fed. Rep. 826. ·

And I am aware of no reported case to the contrary.

The Board of Trade of the City of Chicago, a strictly private corporation—an association of merchants for the conduct of the private business of its members—at great expense, defrayed by assessments, having furnished an exchange hall exclusively for the use of its members, and where their business with each other, and through them the business of their principal (when they deal on commission), is transacted, has established this rule in relation to the collection, compiling and transmitting to its own correspondents, or rather, the business correspondents of its members, market news or statistics. This ingenious device, recently invented, by which the complainant and others are seeking to obtain these reports, and thus to obtain the benefits of membership without becoming members,

with the attending burdens, can not be sustained upon any known principle of law or justice.

GARNETT, J. The question presented by this record is whether the Board of Trade of the City of Chicago has the right to collect the market quotations through its employes on the floor of its exchange, send them to the officers of the telegraph companies as its private dispatches to persons named as its correspondents, and prohibit the companies from transmitting them to any person except those designated by its directors.

The Board of Trade was organized as a private corporation in 1859, and has since continuously conducted its affairs for the benefit of its members only, having no pecuniary interest in the operations taking place on its exchange. Its charter is framed in such terms as we should expect to find in the case of an ordinary private corporation, in whose affairs no one is especially interested except its own members. It has grown into an institution of vast commercial influence, and the quotations of prices coming from its exchange may justly be regarded as a potential factor in fixing market values of the necessaries of life. The growth of the corporation in power and influence does not change its character. Its charter does not impose upon it any duty of a public nature, nor has it assumed any. The interest of its members has been its object from its beginning. It has the right to collect the market quotations or refuse to do so. Having chosen to procure this information, it may dispose of it as its board of directors may order. The expense of compiling the quotations is ultimately borne by the members of the corporation. They, being charged with the expense, should, in all fairness, have the advantage of controlling its distribution. The news so gathered is a species of property (Kiernan v. Manhattan Q. Tel. Co., 50 How. Pr. 194), which the corporation holds and disposes of as a *quasi* trust fund. If the trust is abused or the commands of the directors are disobeyed a member may be entitled to relief on the same principle that any beneficiary of a trust fund may prevent its perversion. But the rights of a member can not be acquired by one who has not submitted to the burdens and conditions of member-

102     APPELLATE COURTS OF ILLINOIS.

VOL. 27.] N. Y. & Chi. Grain & Stock Exch. v. Chi. Bd. of Trade.

ship.   Admission to membership is necessarily a matter vested in the discretion of the board.   The validity of its rules and regulations within the scope of its charter can not be denied. One of the rules makes any person of good character and credit, and of legal age, eligible as a member, on presenting a written application indorsed by two members stating the name and business of the applicant, after ten days notice of such application has been posted on the bulletin board of the exchange and approved by at least ten affirmative votes of the directors, and on payment of an initiation fee of $10,000, or presentation of an unimpaired or unforfeited membership duly transferred, and signing an agreement to abide by the rules, regulations and by-laws of the association.   We are unable to say there is anything unreasonable in this rule.   If it is valid it excludes every person from the benefits of membership who has not conformed to the prescribed terms, and courts have no authority to interfere in the premises.   Another of its rules provides for the collection by its employes of the quotations, and their transmission only to such persons as the directors may approve.   The rule might have directed that the reports be sent to no person except members, and no just complaint could have been made.   In two cases this rule, reserving to the board the power of discrimination in the distribution of its market reports, has been judicially passed upon, and in both instances the power of the board has been upheld.   Bryant v. W. U. Tel. Co., 17 Fed. Rep. 825; Marine G. & S. Exchange v. W. U. Tel. Co., 22 Fed. Rep. 23.

There can be no public policy controlling any course of business unless some public interest will be affected by the failure to control.   It is true that the producers and consumers are alike interested in current prices of the great staples which change hands at this point; but the producer and consumer meet face to face, in the persons of their respective brokers, in the operations of the exchange.   The market news is equally accessible to both.   The agent represents the principal and is liable to him for any neglect or failure in duty which brings him a loss.   The instantaneous news which the appellant contends it has the right to receive from the tele-

graph company, may not reach the principal except by the slower methods of newspaper publication, but his representative, the broker, is at all times in immediate contact with it, and is bound to use it to the best advantage for his principal.

These reports are compiled at the expense of the members of the association and are their private property in their associated capacity. There is no just principle which can deny them the right to name the parties to whom they shall be sent by the instantaneous or any other method. The individual business of each of the members is of a private character; the aggregate business of the members is not of a different character. They have in effect agreed among themselves to regulate the transmission of the telegraphic dispatches relating to their private business, and their competitors in business, who do not choose to become members and pay their fair share of the expenses of procuring this information, should not be allowed to dictate its disposition.

The order of the court below dissolving the injunction and dismissing the bill will be affirmed.

*Order affirmed.*