# INTERNATIONAL NEWS SERVICE *v.* THE ASSOCIATED PRESS.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 221.  Argued May 2, 3, 1918.—Decided December 23, 1918.

An incorporated association of proprietors and representatives of many newspapers, engaged in gathering news and distributing it to its members for publication, is a proper party to represent them in a suit to protect their interests in news so collected against the illegal acts of a rival organization. Equity Rule, 38. P. 233.

The right to object to the non-joinder of parties may be treated as·

waived if not made specifically in the courts below.  Equity Rules, 43, 44.  P. 233.

A news article in a newspaper may be copyrighted under the Act of March 4, 1909, but news, as such, is not copyrightable.  P. 234

As against the public, any special interest of the producer of uncopyrighted news matter is lost upon the first publication.  *Id.*

But one who gathers news, at pains and expense, for the purpose of lucrative publication, may be said to have a *quasi* property in the results of his enterprise, as against a rival in the same business, and the appropriation of those results at the expense and to the damage of the one and for the profit of the other is unfair competition against which equity will afford relief.  P. 236.

An incorporated association of newspaper publishers gathered news, at pains and expense, and without applying for copyright telegraphed it daily to its members throughout the country, for their exclusive use in publication, they paying assessments therefor; a rival corporation, serving other newspapers for pecuniary returns, made a practice of obtaining this news through early publications in newspapers and on bulletins of the first company's members, and of sending it by telegraph, either as so taken or in rewritten form, to its own customers, thus enabling them to compete with the newspapers of the first company in the prompt publication of news obtained for the benefit of the latter by their exclusive agency and at their expense.  *Held*, that the first company, and its members, as against the second company, had an equitable *quasi* property in the news, even after the early publications; that the use made of it by the second company, not as a mere basis for independent investigation but by substantial appropriation, for its own gain and at the expense and to the damage of their enterprise, amounted to unfair competition which should be enjoined, irrespective of the false pretense involved in rewriting articles and in distributing the news without mentioning the source; for this, while accentuating the wrong, was not of its essence.  Pp. 237, *et seq.*; 242.

Upon the pleadings and proofs in this case, *held*, that complainant was not debarred from relief upon the ground of unclean hands by the fact that, following a practice engaged in by the defendant also and by news agencies generally, it had used the defendant's news items, when published, as "tips" for investigations, the results of which it sold.  P. 242.

245 Fed. Rep. 244, affirmed.

THE case is stated in the opinion.

Mr. *Samuel Untermyer* and Mr. *Hiram W. Johnson,* with whom Mr. *Louis Marshall,* Mr. *William A. DeFord* and Mr. *Henry A. Wise* were on the briefs, for petitioner:

Facts are public and not private property. *Davies v. Bowes,* 209 Fed. Rep. 53, 56; *Tribune Co. v. Illinois Publishing Co.,* 76 Publishers' Weekly, 643, 947; *Thompson Co. v. American Law Book Co.,* 122 Fed. Rep. 922; *West Pub. Co. v. Thompson Co.,* 176 Fed. Rep. 839; *Clayton v. Stone,* 2 Paine, 382; *Baker v. Selden,* 101 U. S. 99.

As respondent does not copyright its news, and as the decree is not grounded on any statutory right, respondent must stand or fall on a common-law right. Its position cannot be said to be more favorable than that of the creator of a work of literary or artistic merit. Yet, by the common law, the publication of such works amounts to a dedication to the public and confers a universal right of reproduction and use whether for purposes of gain or otherwise. *Wheaton v. Peters,* 8 Pet. 591, 657; *Jeffreys v. Boosey,* 4 H. L. Cas. 815, 962, 965, 967; *Holmes v. Hurst,* 174 U. S. 85; *Jewelers' Mercantile Agency v. Jewelers' Publishing Co.,* 155 N. Y. 241.

As long ago as 1774, the House of Lords in *Donaldson v. Beckett,* 4 Burr, 2408, note; 2 Brown's P. C. 129, laid down principles which indicate that there can be no ownership in news at common law after publication. To the same effect are: *Tribune Co. of Chicago v. Associated Press,* 116 Fed. Rep. 126; *New York Times Co. v. Sun Publishing Co.,* 204 Fed. Rep. 586; *Tribune Co. v. Illinois Publishing Co.,* 76 Publishers' Weekly, 643, 947; *Walter v. Steinkopff* [1892], L. R. 3 Ch. Div. 489. See also Drone, Copyright, pp. 169, 170; Bowker, Copyright, pp. 88, 89.

A bill to protect news for 24 hours failed of passage in Congress; the decree below recognizes a right in the respondent which Congress deemed it wise to withhold.

That the posting of bulletins and the issuance of early editions of newspapers by its members were regarded by respondent as a publication is clearly shown by the bill, and in Arts. VII and VIII of its by-laws.

If, with respondent's consent, the news which the petitioner is claimed to have copied had been printed in the form of an uncopyrighted book, petitioner undoubtedly could have multiplied and circulated copies without violating respondent's rights. The situation is no different where the publication is in a daily newspaper and the subject-matter is one of passing interest.

The principle that applies to literary property is equally applicable to any idea, trade secret, or business plan, which one may conceive or originate. See *Peabody* v. *Norfolk*, 98 Massachusetts, 452; *Bristol* v. *Equitable Life Assurance Society*, 132 N. Y. 264; *Stein* v. *Morris*, 91 S. E. Rep. 177; *Hamilton Mfg. Co.* v. *Tubbs*, 216 Fed. Rep. 401; *Haskins* v. *Ryan*, 71 N. J. Eq. 575. *Cf. Westcott Chuck Co.* v. *Oneida National Chuck Co.*, 199 N. Y. 247; *Montegut* v. *Hickson*, 178 App. Div. 94.

Upon publication, the news becomes the common possession of all to whom it is accessible; private property therein dies with its publication, as in the case of a trade secret. Publication, being expressly authorized, constitutes no breach of trust or confidence by respondent's members. Neither its charter nor its by-laws required that news gathered by it remain confidential until its publication has been accomplished by all members. But even such a provision would not bind the public. No limitation of the use, by contract or otherwise, is imposed upon the purchaser of the newspaper or the reader of a bulletin. He does not receive the news as a confidential communication, or as a secret or impressed with a trust. The petitioner occupied no contractual or fiduciary relation toward the respondent; nor did it receive the information confidentially or under the seal of secrecy.

Whatever information it obtained it secured in common with the public.

The holding of the Court of Appeals that respondent and its members have a property right in the news until the reasonable reward of each member is received, is a mere conclusion, unsupported by reason. It confounds the corporation and its members. We are not here concerned with the rights of the latter, whose individual interests cannot be enforced in an action by the corporation. To admit respondent's ownership not only of all despatches published in papers of its members and credited to the respondent or not otherwise credited, and also of the local news collected and published by its members, would result in assuring to that organization absolute dominion over the news of the country. Its service is not available to any newspaper that may desire to avail itself of it or to anyone not a member who may wish to embark in the newspaper business. By its carefully guarded by-laws, the respondent restricts its service against such use. In holding that there can be no "publication" until each of respondent's members has been enabled to publish the news, the court below disregards the definition of that term as laid down by the lexicographers and authorities,—the act by which a thing is made public or is given publicity. *Tribune Co. of Chicago* v. *Associated Press*, 116 Fed. Rep. 126; *LeRoy* v. *Jameson*, 15 Fed. Cas. 373, 376; *United States* v. *Williams*, 3 Fed. Rep. 484, 486; *United States* v. *Comerford*, 25 Fed. Rep. 902, 903; *D'Ole* v. *Kansas City Star Co.*, 94 Fed. Rep. 840, 842; *Hale* v. *Grey*, 21 Nevada, 278; *Sproul* v. *Pillsbury*, 72 Maine, 20, 21. If publication does not convert the news into public property, it is difficult to understand how respondent's property right continues until its full commercial news value has been utilized, or how its existence as a right should be measured by the arbitrary term of "three or four hours." A property right is not de-

pendent upon its commercial value. The contention that no publication, however general, can destroy the property of the collector of news in the information he has gathered is in direct conflict with the doctrines applicable to authors, inventors and artists, who, upon publication without seeking statutory protection, lose whatever property rights they may have. And with respect to capital and expenditures involved, the gatherer of news is in no different position than is the author or inventor.

None of the elements of unfair competition is to be found in this case. The respondent had no ownership in the facts. The petitioner did not in any way sail under false colors or pretend that the news which it distributed was that of the respondent. In fact, the complaint proceeds upon the very converse of that theory. Nor did the petitioner resort to any of the methods which have been held to constitute unfair competition. *McLean* v. *Fleming*, 96 U. S. 245; *Lawrence Mfg. Co.* v. *Tennessee Mfg. Co.*, 138 U. S. 537; *Coats* v. *Merrick Thread Co.*, 149 U. S. 562; *Elgin National Watch Co.* v. *Illinois Watch Co.*, 179 U. S. 675; *Howe Scale Co.* v. *Wyckoff, Seamans & Benedict*, 198 U. S. 118, 140; *Diamant* v. *Lewis*, 144 Iowa, 509, 517. In no case has the doctrine of unfair competition been extended to a case where there is no element of deception, misrepresentation or confusion. The rule applied in *Singer Mfg. Co.* v. *June Mfg. Co.*, 163 U. S. 169, 185, to an expired patent or copyright is *a fortiori* applicable where there has been no patent or copyright. See also *Dover Stamping Co.* v. *Fellows*, 163 Massachusetts, 191; *Bamford* v. *Douglass Post Card Machine Co.*, 158 Fed. Rep. 355.

The acts charged against respondent's predecessor in *Tribune Co. of Chicago* v. *Associated Press*, 116 Fed. Rep. 126, were held to be lawful when committed by it. What is it that converts the same acts, when charged against the petitioner, into *dolus* or unfair competition? Nor is

it clear how the respondent's reading and using as a "tip" of petitioner's news, sent out to respondent's members in the form of news, differs from the act charged against the petitioner. When the verified "tip" is sent out, it in reality disseminates for the benefit of respondent and its members the petitioner's news. Unfair competition cannot be predicated upon a universal custom in which the respondent and all other news agencies and newspapers participate. If the petitioner is chargeable with unfair competition, he who, for profit and in competition with an author or inventor who fails to take out a copyright or patent, makes use of the book, machine, process, etc., is equally guilty of unfair competition.

If it was wrong for the petitioner to utilize news published with the consent of the respondent, it was equally wrong for the respondent to utilize the news of the petitioner published by its subscribers. He who comes into equity must come with clean hands. *Thompson Co.* v. *American Law Book Co.*, 122 Fed. Rep. 922; *Worden* v. *California Fig Syrup Co.*, 187 U. S. 516; *Manhattan Medicine Co.* v. *Wood*, 108 U. S. 218; *Prince Mfg. Co.* v. *Prince's Metallic Paint Co.*, 135 N. Y. 24; *Uri* v. *Hirsch*, 123 Fed. Rep. 568; and other cases.

*Mr. Frederick W. Lehmann*, with whom *Mr. Frederic B. Jennings, Mr. Winfred T. Denison* and *Mr. Peter S. Grosscup* were on the briefs, for respondent:

News as a business commodity is property, because it costs money and labor to produce and because it has value for which those who have it not are ready to pay. Its sole elements of value are its novelty, its accuracy and its presence in the place where there are people interested enough to pay for knowing it, and at the time when they are so interested. The respondent at large cost has established and operates an organization of labor and capital covering the whole world, and the product

of this effort and expense is its property, because it made it. This is not to say that, if it first discovers the happening of an event and transforms that discovery into a thing of commercial value, it has an exclusive right to all announcement of that happening. Any other organization has the same right to whatever message it may itself create, but it can have no right to appropriate the message which another has secured and created by his exclusive effort and expense. See *Bleistein* v. *Donaldson,* 188 U. S. 249.

That there is a property right in news, as a business commodity, is settled in this court by *Hunt* v. *New York Cotton Exchange,* 205 U. S. 322, 333, and *Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236, 250. The latter case affirmed *Board of Trade* v. *Kinsey Co.,* 130 Fed. Rep. 507, 513, which held directly that there is a property right in news in the form of price quotations which is entitled to protection against appropriation. See also *Board of Trade* v. *Tucker,* 221 Fed. Rep. 305; *National Tel News Co.* v. *Western Union Tel Co.,* 119 Fed. Rep. 294; *Board of Trade* v. *McDearmott Co.,* 143 Fed. Rep. 188; *Board of Trade* v. *Hadden-Krull Co.,* 109 Fed. Rep. 705; *Board of Trade* v. *Cella Commission Co.,* 145 Fed. Rep. 28; *Dodge Co.* v. *Construction Information Co.,* 183 Massachusetts, 66; *Kiernan* v. *Manhattan Quotation Tel. Co.,* 50 How. Pr. 194, 196, 198. This principle has also been recognized in England. *Exchange Telegraph Co.* v. *Howard,* 22 Times Law Rep. 375; *Exchange Telegraph Co.* v. *Gregory & Co.* [1896], 1 Q. B. 147; *Exchange Telegraph Co.* v. *Central News, Ltd.* [1897], 2 Ch. 48; *Cox* v. *Land & Water Journal Co.,* L. R. 9 Eq. 324.

To hold that respondent has this property right, and yet is entitled to but one exclusive publication by one of its members, would be to destroy the property the instant its value is commercially available, and set up an artificial doctrine of law under which the business of

news collection and distribution cannot live. By the very inherent nature of this property right it continues to exist, as a matter of law, and to be entitled to protection until the full commercial value of the news has been realized. The cases cited *supra* base the recognition of the right in news as a property right upon its value as a commercial product, resulting from the use of capital and labor, and possessing value capable of being realized only by sale and purchase. The courts have recognized this right by adjusting the time of the protection in such a way as to make it effective for the particular circumstances. See *Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 251; *National Tel. News Co.* v. *Western Union Tel. Co.,* 119 Fed. Rep. 294. The present case is like the trade-mark cases, and analogous to *Fonotipia* v. *Bradley,* 171 Fed. Rep. 951, 960; *Prest-O-Lite Co.* v. *Davis,* 209 Fed. Rep. 917; *Universal Film Co.* v. *Copperman,* 218 Fed. Rep. 577; and *Ferris* v. *Frohman,* 223 U. S. 424.

Nothing short of an intentional transfer and surrender of respondent's property right by its own act will destroy it. No such voluntary surrender for purposes of sale by a competing news agency can be predicated upon the publication of its news by one of its members in the first edition of a newspaper. Such publication is not an abandonment for all purposes. It was not intended, nor can it be implied, that the public could take the news and sell it in competition with the respondent.

The rule by which literary property is supposed to cease upon an unrestricted publication, without copyright, is inapplicable to the conditions which make and support the status of news as property. See *National Tel. News Co.* v. *Western Union Tel. Co.,* 119 Fed. Rep. 294; and *Dodge Co.* v. *Construction Information Co.,* 183 Massachusetts, 66. Assuming that news is "literary property," and circumscribed by all the limitations imposed by law upon such property, the petitioner's claim of a right

of unrestrained piracy would be invalid, because the publication here is not unrestricted and also because at common law an author had a permanent right of exclusive publication. Slater on Copyright, p. 9; Story on the Constitution, § 1152; Drone on Copyright, p. 116; *Miller* v. *Taylor*, 4 Burrows, 2303; *Donaldson* v. *Beckett*, 2 Bro. P. C. 129; *French* v. *Maguire*, 55 How. Pr. 471, 479; *Holmes* v. *Hurst*, 174 U. S. 82, 85; and the only question has been whether this right is superseded by the copyright statutes. As to publications such as are involved in the case at bar, which cannot be copyrighted, the common-law rights, not being superseded by statute, still persist. Indeed, this court has held that the copyright statute does not apply to "a work of so fluctuating and fugitive a form as that of a newspaper." *Baker* v. *Selden*, 101 U. S. 99, 105.

News has no resemblance of any kind to literary property, and the reasons which exist for limiting the life of a copyright are wholly inapplicable to news. News is not locked in the brain of the producer, but is the event to which all persons have equal access. The right of the owner of a certain report of an event to prevent its appropriation by others in no sense deprives the public of the benefit of knowledge of the event. Others by their own efforts may develop a similar report and even use the report of the person who first acquires the knowledge as a guide. This conserves the interests of the respondent and all interest of public policy, and imposes upon the petitioner no burden except that of making no unearned profit at the expense of the respondent. This is a complete answer to the contention that the injunction will result in the creation of a monopoly in the respondent.

In cases arising under the copyright statute, as well as in some of the news ticker and other cases not affected by the statute, the courts have based their construction of what constitutes such a publication as will destroy the

property right upon a conception of voluntary dedication to the public; and where a restriction is made either expressly or by implication the owner's rights continue, however broad and unlimited the publication may otherwise be. This doctrine, so far as applied to cases outside the statute, has been seized upon by courts apparently as a means of adjusting the law of literary property and copyright to the business necessities of news service. See *National Tel. News Co.* v. *Western Union Tel. Co.*, *supra;* *Board of Trade* v. *Hadden-Krull Co.*, 109 Fed. Rep. 705; *Board of Trade* v. *Tucker*, 221 Fed. Rep. 305, 307; *Board of Trade* v. *McDearmott Commission Co.*, 143 Fed. Rep. 188. In fact from the decision in *Kiernan* v. *Manhattan Quotation Tel. Co.*, 50 How. Pr. 194, in 1876, down to this date, no case can be found where an injunction has been denied for lack of express or implied restriction in the publication of news or matters analogous to news. *Tribune Co. of Chicago* v. *Associated Press*, 116 Fed. Rep. 126, which was decided prior to the *National Telegraph* and *Hadden-Krull Cases*, was decided upon special grounds of copyright, which are inapplicable here. None of the ticker cases are really cases of restriction in the number and identity of the persons who are to be allowed to read the report, excepting as they are restricted by fundamental principles of fair dealing and the restraints against misappropriation. And if it be material to find a restriction it is that which is implied against the use to which the readers may put the ticker news; nobody is intended to be given any right to take the news from the ticker tape for commercial sale as news.

The publication of Associated Press news by its members is no more a dedication of that news to the readers for all purposes than are the performances of plays which, however public, have been held not to include a dedication for purposes of reproduction from memory, *Tompkins* v. *Halleck*, 133 Massachusetts, 32; *Aronson* v. *Baker*,

43 N. J. Eq. 365; *Boucicault* v. *Fox*, 5 Blatchf. 87; *Boucicault* v. *Hart*, 13 Blatchf. 47; *Crowe* v. *Aiken*, 2 Biss. 215; *Universal Film Co.* v. *Copperman*, 218 Fed. Rep. 577; *Ferris* v. *Frohman*, 223 U. S. 424; or the public delivery of lectures, even with provision of printed copies for students, *Drummond* v. *Altemus*, 60 Fed. Rep. 338; *Abernethy* v. *Hutchinson*, 3 L. J. (O. S.) Ch. 209; *Bartlette* v. *Crittenden*, 4 McLean, 300; *Bartlett* v. *Crittenden*, 5 McLean, 32; *Nicols* v. *Pitman*, L. R. 26 Ch. D. 374; *Caird* v. *Sime*, L. R. 12 App. Cas. 326; or the exhibition of pictures and publication of engravings, *Werckmeister* v. *American Lithographic Co.*, 134 Fed. Rep. 321; 207 U. S. 299; *Turner* v. *Robinson*, 10 Ir. Eq. Rep. 121.

The practice of taking respondent's news from early editions and bulletins and selling and distributing it without any original investigation and without any expense is unfair business competition. It makes the respondent's collecting agencies the direct servant and source of supply for business goods to be distributed and sold by the petitioner. Complete country-wide publication of the news collected by the respondent is the only possible way in which it can "gain its reward" for its expenditure, and it is the very foundation upon which the whole business rests. The collecting labor and expense cannot be severed from the distribution and reimbursement. Furthermore, the public has an interest in the efficiency of industry, as its means of supporting life; the public interest can never be promoted by encouraging unfair, inequitable or dishonorable practices, which must inevitably result in the destruction of the producing work; and moreover, where one news agency takes its news from another the public does not get the benefit of news collected by two independent associations.

It is immaterial in what manner the petitioner gets respondent's news, so long as the use it makes of the

news is to compete unfairly. It is no defense that peti-
tioner sold it as its own, as if gathered by its own inde-
pendent efforts. The appropriation and use is just as
unfair as if it were frankly accredited to the respondent.
As well might a manufacturer argue that he was entitled
to use his rival's trade-mark for competitive commercial
purposes, merely because he may lawfully purchase a
package marked with it. Acts which might be innocent
and lawful if done under other circumstances are injurious
and unlawful if they operate unfairly in competition.
*Aikens* v. *Wisconsin*, 195 U. S.. 194, 200; *United States* v.
*Eastman Kodak Co.*, 226 Fed. Rep. 62, 74; 230 Fed. Rep.
522, 524; *United States* v. *American Can Co.*, 230 Fed.
Rep. 859, 887, 888; *Tuttle* v. *Buck*, 107 Minnesota, 145;
*Dunshee* v. *Standard Oil Co.*, 152 Iowa, 618, 626; "Trust
Laws. and Unfair Competition," U. S. Bureau of Corpora-
tions, March 15, 1915, pp. 463–486, 496, 497, 117,
118; 20 Harvard Law Review, 420; *Eastern States Re-
tail Lumber. Dealers' Assn.* v. *United States*, 234 U. S.
600, 614. The "fighting ship" cases are based on the
same principle. *United States* v. *Hamburg American
S. S. Line*, 216 Fed. Rep. 971, 973, 974: *United States* v.
*Hamburg, etc., Gesellschäft*, 200 Fed. Rep. 806; *United
States* v. *American-Asiatic S. S. Co.*, 220 Fed. Rep. 235.
Even free speech is subject to the condition that it should
not be used unfairly in competition. *Gompers* v. *Bucks
Stove & Range Co.*, 221 U. S. 418, 437, 438. While a
competitor can further his business by selling below
other men's prices or below cost for the purpose of re-
ducing loss of excess stock, he cannot do either of these
acts in such a manner, and for such a purpose, as will
drive a competitor out of business. *Nash* v. *United States*,
229 U. S. 373, 376; *Standard Oil Co.* v. *United States*, 221
U. S. 1, 43; *Central Lumber Co.* v. *South Dakota*, 226
U. S. 157, 160; *United States* v. *Great Lakes Towing Co.*,
208 Fed. Rep. 733, 743–745; *United States* v. *Pacific Co.*,

228 U. S. 87; *United States* v. *American Can Co.*, 230 Fed. Rep. 859, 887, 888; *Ware-Kramer Co.* v. *American Tobacco Co.*, 180 Fed. Rep. 160, 167.

The "unclean hands" doctrine does not mean that whenever a complainant has been guilty of inequitable conduct the courts will refuse to grant him relief; it means merely that equity will refuse to aid a complainant in protecting any right acquired or retained by inequitable conduct. This distinction is made in the *Christie Case, supra;* and in *Wilder Mfg. Co.* v. *Corn Products Co.*, 236 U. S. 165, 172. In *Prince Mfg. Co.* v. *Prince's Metallic Paint Co.*, 135 N. Y. 24; *Fetridge* v. *Wells*, 4 Abb. Pr. 144; and *Manhattan Medicine Co.* v. *Wood*, 108 U. S. 218, the court refused to protect the plaintiff's trade name on the ground that an injunction would directly further the inequitable practices of the plaintiff. The principle upon which courts of equity will apply this doctrine is illustrated by *Primeau* v. *Granfield*, 180 Fed. Rep. 851; *Chute* v. *Wisconsin Chemical Co.*, 185 Fed. Rep. 115; *Bentley* v. *Tibbals*, 223 Fed. Rep. 247, 252; *Talbot* v. *Independent Order of Owls*, 220 Fed. Rep. 660.

No showing has been made that the practices were authorized or approved by those responsible for the policies of the Associated Press. *Vulcan Detinning Co.* v. *American Can Co.*, 72 N. J. Eq. 387.

The petitioner's contention that the respondent has obtained news by the same methods as those used by defendant was not sustained in fact. "Tipping off" has been a recognized practice among all news agencies and has existed by common consent, and, as found by the District Court, is the only one authorized or adopted by the respondent. When the "tip" is received, it is independently investigated, and the news obtained in this way is as much the product of respondent's effort and entitled to protection as its property as if it had been obtained without any "tip." This practice is not

in any sense unjust or unlawful, and does not constitute unfair competition. The right of another news agency to use the report as a "tip" for investigation on its own account is vital to the public need of correct information. The legality of similar practices in other businesses has been recognized. *Thompson Co.* v. *American Law Book Co.*, 122 Fed. Rep. 922; *West Publishing Co.* v. *Thompson Co.*, 176 Fed. Rep. 833, 838; *Pike* v. *Nicholas*, L. R. 5 Ch. App. 263; *Morris* v. *Wright*, L. R. 5 Ch. App. 287; *Moffatt* v. *Gill*, 86 Law Times Rep. 465.

Mr. Justice Pitney delivered the opinion of the court.

The parties are competitors in the gathering and distribution of news and its publication for profit in newspapers throughout the United States. The Associated Press, which was complainant in the District Court, is a coöperative organization, incorporated under the Membership Corporations Law of the State of New York, its members being individuals who are either proprietors or representatives of about 950 daily newspapers published in all parts of the United States. That a corporation may be organized under that act for the purpose of gathering news for the use and benefit of its members and for publication in newspapers owned or represented by them, is recognized by an amendment enacted in 1901 (Laws N. Y. 1901, c. 436). Complainant gathers in all parts of the world, by means of various instrumentalities of its own, by exchange with its members, and by other appropriate means, news and intelligence of current and recent events of interest to newspaper readers and distributes it daily to its members for publication in their newspapers. The cost of the service, amounting approximately to $3,500,000 per annum, is assessed upon the members and becomes a part of their costs of operation, to be recouped, presumably with profit, through

the publication of their several newspapers. Under complainant's by-laws each member agrees upon assuming membership that news received through complainant's service is received exclusively for publication in a particular newspaper, language, and place specified in the certificate of membership, that no other use of it shall be permitted, and that no member shall furnish or permit anyone in his employ or connected with his newspaper to furnish any of complainant's news in advance of publication to any person not a member. And each member is required to gather the local news of his district and supply it to the Associated Press and to no one else.

Defendant is a corporation organized under the laws of the State of New Jersey, whose business is the gathering and selling of news to its customers and clients, consisting of newspapers published throughout the United States, under contracts by which they pay certain amounts at stated times for defendant's service. It has wide-spread news-gathering agencies; the cost of its operations amounts, it is said, to more than $2,000,000 per annum; and it serves about 400 newspapers located in the various cities of the United States and abroad, a few of which are represented, also, in the membership of the Associated Press.

The parties are in the keenest competition between themselves in the distribution of news throughout the United States; and so, as a rule, are the newspapers that they serve, in their several districts.

Complainant in its bill, defendant in its answer, have set forth in almost identical terms the rather obvious circumstances and conditions under which their business is conducted. The value of the service, and of the news furnished, depends upon the promptness of transmission, as well as upon the accuracy and impartiality of the news; it being essential that the news be transmitted to members or subscribers as early or earlier than similar information can be furnished to competing newspapers

by other news services, and that the news furnished by each agency shall not be furnished to newspapers which do not contribute to the expense of gathering it.  And further, to quote from the answer: "Prompt knowledge and publication of world-wide news is essential to the conduct of a modern newspaper, and by reason of the enormous expense incident to the gathering and distribution of such news, the only practical way in which a proprietor of a newspaper can obtain the same is, either through coöperation with a considerable number of other newspaper proprietors in the work of collecting and distributing such news, and the equitable division with them of the expenses thereof, or by the purchase of such news from some existing agency engaged in that business."

The bill was filed to restrain the pirating of complainant's news by defendant in three ways: First, by bribing employees of newspapers published by complainant's members to furnish Associated Press news to defendant before publication, for transmission by telegraph and telephone to defendant's clients for publication by them; Second, by inducing Associated Press members to violate its by-laws and permit defendant to obtain news before publication; and Third, by copying news from bulletin boards and from early editions of complainant's newspapers and selling this, either bodily or after rewriting it, to defendant's customers.

The District Court, upon consideration of the bill and answer, with voluminous affidavits on both sides, granted a preliminary injunction under the first and second heads; but refused at that stage to restrain the systematic practice admittedly pursued by defendant, of taking news bodily from the bulletin boards and early editions of complainant's newspapers and selling it as its own.  The court expressed itself as satisfied that this practice amounted to unfair trade, but as the legal question was

one of first impression it considered that the allowance of an injunction should await the outcome of an appeal. 240 Fed. Rep. 983, 996. Both parties having appealed, the Circuit Court of Appeals sustained the injunction order so far as it went, and upon complainant's appeal modified it and remanded the cause with directions to issue an injunction also against any bodily taking of the words or substance of complainant's news until its commercial value as news had passed away. 245 Fed. Rep. 244, 253. The present writ of certiorari was then allowed. 245 U. S. 644.

The only matter that has been argued before us is whether defendant may lawfully be restrained from appropriating news taken from bulletins issued by complainant or any of its members, or from newspapers published by them, for the purpose of selling it to defendant's clients. Complainant asserts that defendant's admitted course of conduct in this regard both violates complainant's property right in the news and constitutes unfair competition in business. And notwithstanding the case has proceeded only to the stage of a preliminary injunction, we have deemed it proper to consider the underlying questions, since they go to the very merits of the action and are presented upon facts that are not in dispute. As presented in argument, these questions are: 1. Whether there is any property in news; 2. Whether, if there be property in news collected for the purpose of being published, it survives the instant of its publication in the first newspaper to which it is communicated by the news-gatherer; and 3. Whether defendant's admitted course of conduct in appropriating for commercial use matter taken from bulletins or early editions of Associated Press publications constitutes unfair competition in trade.

The federal jurisdiction was invoked because of diversity of citizenship, not upon the ground that the suit arose under the copyright or other laws of the United

States. Complainant's news matter is not copyrighted. It is said that it could not, in practice, be copyrighted, because of the large number of dispatches that are sent daily; and, according to complainant's contention, news is not within the operation of the copyright act. Defendant, while apparently conceding this, nevertheless invokes the analogies of the law of literary property and copyright, insisting as its principal contention that, assuming complainant has a right of property in its news, it can be maintained (unless the copyright act be complied with) only by being kept secret and confidential, and that upon the publication with complainant's consent of uncopyrighted news by any of complainant's members in a newspaper or upon a bulletin board, the right of property is lost, and the subsequent use of the news by the public or by defendant for any purpose whatever becomes lawful.

A preliminary objection to the form in which the suit is brought may be disposed of at the outset. It is said that the Circuit Court of Appeals granted relief upon considerations applicable to particular members of the Associated Press, and that this was erroneous because the suit was brought by complainant as a corporate entity, and not by its members; the argument being that their interests cannot be protected in this proceeding any more than the individual rights of a stockholder can be enforced in an action brought by the corporation. From the averments of the bill, however, it is plain that the suit in substance was brought for the benefit of complainant's members, and that they would be proper parties, and, except for their numbers, perhaps necessary parties. Complainant is a proper party to conduct the suit as representing their interest; and since no specific objection, based upon the want of parties, appears to have been made below, we will treat the objection as waived. See Equity Rules 38, 43, 44.

In considering the general question of property in news matter, it is necessary to recognize its dual character, distinguishing between the substance of the information and the particular form or collocation of words in which the writer has communicated it.

No doubt news articles often possess a literary quality, and are the subject of literary property at the common law; nor do we question that such an article, as a literary production, is the subject of copyright by the terms of the act as it now stands. In an early case at the circuit Mr. Justice Thompson held in effect that a newspaper was not within the protection of the copyright acts of 1790 and 1802 (*Clayton* v. *Stone*, 2 Paine, 382; 5 Fed. Cas. No. 2872). But the present act is broader; it provides that the works for which copyright may be secured shall include "all the writings of an author," and specifically mentions "periodicals, including newspapers." Act of March 4, 1909, c. 320, §§ 4 and 5, 35 Stat. 1075, 1076. Evidently this admits to copyright a contribution to a newspaper, notwithstanding it also may convey news; and such is the practice of the copyright office, as the newspapers of the day bear witness. See Copyright Office Bulletin No. 15 (1917), pp. 7, 14, 16–17.

But the news element—the information respecting current events contained in the literary production—is not the creation of the writer, but is a report of matters that ordinarily are *publici juris;* it is the history of the day. It is not to be supposed that the framers of the Constitution, when they empowered Congress "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries" (Const., Art I, § 8, par. 8), intended to confer upon one who might happen to be the first to report a historic event the exclusive right for any period to spread the knowledge of it.

We need spend no time, however, upon the general

question of property in news matter at common law, or the application of the copyright act, since it seems to us the case must turn upon the question of unfair competition in business. And, in our opinion, this does not depend upon any general right of property analogous to the common-law right of the proprietor of an unpublished work to prevent its publication without his consent; nor is it foreclosed by showing that the benefits of the copyright act have been waived. We are dealing here not with restrictions upon publication but with the very facilities and processes of publication. The peculiar value of news is in the spreading of it while it is fresh; and it is evident that a valuable property interest in the news, as news, cannot be maintained by keeping it secret. Besides, except for matters improperly disclosed, or published in breach of trust or confidence, or in violation of law, none of which is involved in this branch of the case, the news of current events may be regarded as common property What we are concerned with is the business of making it known to the world, in which both parties to the present suit are engaged. That business consists in maintaining a prompt, sure, steady, and reliable service designed to place the daily events of the world at the breakfast table of the millions at a price that, while of trifling moment to each reader, is sufficient in the aggregate to afford compensation for the cost of gathering and distributing it, with the added profit so necessary as an incentive to effective action in the commercial world. The service thus performed for newspaper readers is not only innocent but extremely useful in itself, and indubitably constitutes a legitimate business. The parties are competitors in this field; and, on fundamental principles, applicable here as elsewhere, when the rights or privileges of the one are liable to conflict with those of the other, each party is under a duty so to conduct its own business as not unnecessarily or unfairly to injure

that of the other. *Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U. S. 229, 254.

Obviously, the question of what is unfair competition in business must be determined with particular reference to the character and circumstances of the business. The question here is not so much the rights of either party as against the public but their rights as between themselves. See *Morison* v. *Moat,* 9 Hare, 241, 258. And although we may and do assume that neither party has any remaining property interest as against the public in uncopyrighted news matter after the moment of its first publication, it by no means follows that there is no remaining property interest in it as between themselves. For, to both of them alike, news matter, however little susceptible of ownership or dominion in the absolute sense, is stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those who will pay money for it, as for any other merchandise. Regarding the news, therefore, as but the material out of which both parties are seeking to make profits at the same time and in the same field, we hardly can fail to recognize that for this purpose, and as between them, it must be regarded as *quasi* property, irrespective of the rights of either as against the public.

In order to sustain the jurisdiction of equity over the controversy, we need not affirm any general and absolute property in the news as such. The rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right (*In re Sawyer,* 124 U. S. 200, 210; *In re Debs,* 158 U. S. 564, 593); and the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard property already acquired. *Truax* v. *Raich,* 239 U. S. 33, 37–38; *Brennan* v. *United Hatters,* 73 N. J. L. 729, 742;

*Barr* v. *Essex Trades Council,* 53 N. J. Eq. 101. It is this right that furnishes the basis of the jurisdiction in the ordinary case of unfair competition.

The question, whether one who has gathered general information or news at pains and expense for the purpose of subsequent publication through the press has such an interest in its publication as may be protected from interference, has been raised many times, although never, perhaps, in the precise form in which it is now presented.

*Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236, 250, related to the distribution of quotations of prices on dealings upon a board of trade, which were collected by plaintiff and communicated on confidential terms to numerous persons under a contract not to make them public. This court held that, apart from certain special objections that were overruled, plaintiff's collection of quotations was entitled to the protection of the law; that, like a trade secret, plaintiff might keep to itself the work done at its expense, and did not lose its right by communicating the result to persons, even if many, in confidential relations to itself, under a contract not to make it public; and that strangers should be restrained from getting at the knowledge by inducing a breach of trust.

In *National Tel. News Co.* v. *Western Union Tel. Co.,* 119 Fed. Rep. 294, the Circuit Court of Appeals for the Seventh Circuit dealt with news matter gathered and transmitted by a telegraph company, and consisting merely of a notation of current events having but a transient value due to quick transmission and distribution; and, while declaring that this was not copyrightable although printed on a tape by tickers in the offices of the recipients, and that it was a commercial not a literary product, nevertheless held that the business of gathering and communicating the news—the service of purveying it—was a legitimate business, meeting a distinctive commercial want and adding to the facilities of the business

world, and partaking of the nature of property in a sense that entitled it to the protection of a court of equity against piracy.

Other cases are cited, but none that we deem it necessary to mention.

Not only do the acquisition and transmission of news require elaborate organization and a large expenditure of money, skill, and effort; not only has it an exchange value to the gatherer, dependent chiefly upon its novelty and freshness, the regularity of the service, its reputed reliability and thoroughness, and its adaptability to the public needs; but also, as is evident, the news has an exchange value to one who can misappropriate it.

The peculiar features of the case arise from the fact that, while novelty and freshness form so important an element in the success of the business, the very processes of distribution and publication necessarily occupy a good deal of time. Complainant's service, as well as defendant's, is a daily service to daily newspapers; most of the foreign news reaches this country at the Atlantic seaboard, principally at the City of New York, and because of this, and of time differentials due to the earth's rotation, the distribution of news matter throughout the country is principally from east to west; and, since in speed the telegraph and telephone easily outstrip the rotation of the earth, it is a simple matter for defendant to take complainant's news from bulletins or early editions of complainant's members in the eastern cities and at the mere cost of telegraphic transmission cause it to be published in western papers issued at least as early as those served by complainant. Besides this, and irrespective of time differentials, irregularities in telegraphic transmission on different lines, and the normal consumption of time in printing and distributing the newspaper, result in permitting pirated news to be placed in the hands of defendant's readers sometimes simultaneously with the service

of competing Associated Press papers, occasionally even earlier.

Defendant insists that when, with the sanction and approval of complainant, and as the result of the use of its news for the very purpose for which it is distributed, a portion of complainant's members communicate it to the general public by posting it upon bulletin boards so that all may read, or by issuing it to newspapers and distributing it indiscriminately, complainant no longer has the right to control the use to be made of it; that when it thus reaches the light of day it becomes the common possession of all to whom it is accessible; and that any purchaser of a newspaper has the right to communicate the intelligence which it contains to anybody and for any purpose, even for the purpose of selling it for profit to newspapers published for profit in competition with complainant's members.

The fault in the reasoning lies in applying as a test the right of the complainant as against the public, instead of considering the rights of complainant and defendant, competitors in business, as between themselves. The right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously, for any legitimate purpose not unreasonably interfering with complainant's right to make merchandise of it, may be admitted; but to transmit that news for commercial use, in competition with complainant—which is what defendant has done and seeks to justify—is a very different matter. In doing this defendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest

of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have, earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself, and a court of equity ought not to hesitate long in characterizing it as unfair competition in business.

The underlying principle is much the same as that which lies at the base of the equitable theory of consideration in the law of trusts—that he who has fairly paid the price should have the beneficial use of the property. Pom. Eq. Jur., § 981. It is no answer to say that complainant spends its money for that which is too fugitive or evanescent to be the subject of property. That might, and for the purposes of the discussion we are assuming that it would, furnish an answer in a common-law controversy. But in a court of equity, where the question is one of unfair competition, if that which complainant has acquired fairly at substantial cost may be sold fairly at substantial profit, a competitor who is misappropriating it for the purpose of disposing of it to his own profit and to the disadvantage of complainant cannot be heard to say that it is too fugitive or evanescent to be regarded as property. It has all the attributes of property necessary for determining that a misappropriation of it by a competitor is unfair competition because contrary to good conscience.

The contention that the news is abandoned to the public for all purposes when published in the first newspaper is untenable. Abandonment is a question of intent, and the entire organization of the Associated Press negatives such a purpose. The cost of the service would be prohibitive if the reward were to be so limited. No single

newspaper, no small group of newspapers, could sustain the expenditure. Indeed, it is one of the most obvious results of defendant's theory that, by permitting indiscriminate publication by anybody and everybody for purposes of profit in competition with the news-gatherer, it would render publication profitless, or so little profitable as in effect to cut off the service by rendering the cost prohibitive in comparison with the return. The practical needs and requirements of the business are reflected in complainant's by-laws which have been referred to. Their effect is that publication by each member must be deemed not by any means an abandonment of the news to the world for any and all purposes, but a publication for limited purposes; for the benefit of the readers of the bulletin or the newspaper as such; not for the purpose of making merchandise of it as news, with the result of depriving complainant's other members of their reasonable opportunity to obtain just returns for their expenditures.

It is to be observed that the view we adopt does not result in giving to complainant the right to monopolize either the gathering or the distribution of the news, or, without complying with the copyright act, to prevent the reproduction of its news articles; but only postpones participation by complainant's competitor in the processes of distribution and reproduction of news that it has not gathered, and only to the extent necessary to prevent that competitor from reaping the fruits of complainant's efforts and expenditure, to the partial exclusion of complainant, and in violation of the principle that underlies the maxim *sic utere tuo,* etc.

It is said that the elements of unfair competition are lacking because there is no attempt by defendant to palm off its goods as those of the complainant, characteristic of the most familiar, if not the most typical, cases of unfair competition. *Howe Scale Co.* v. *Wyckoff, Seamans & Benedict,* 198 U. S. 118, 140. But we cannot concede that

the right to equitable relief is confined to that class of cases. In the present case the fraud upon complainant's rights is more direct and obvious. Regarding news matter as the mere material from which these two competing parties are endeavoring to make money, and treating it, therefore, as *quasi* property for the purposes of their business because they are both selling it as such, defendant's conduct differs from the ordinary case of unfair competition in trade principally in this that, instead of selling its own goods as those of complainant, it substitutes misappropriation in the place of misrepresentation, and sells complainant's goods as its own.

Besides the misappropriation, there are elements of imitation, of false pretense, in defendant's practices. The device of rewriting complainant's news articles, frequently resorted to, carries its own comment. The habitual failure to give credit to complainant for that which is taken is significant. Indeed, the entire system of appropriating complainant's news and transmitting it as a commercial product to defendant's clients and patrons amounts to a false representation to them and to their newspaper readers that the news transmitted is the result of defendant's own investigation in the field. But these elements, although accentuating the wrong, are not the essence of it. It is something more than the advantage of celebrity of which complainant is being deprived.

The doctrine of unclean hands is invoked as a bar to relief; it being insisted that defendant's practices against which complainant seeks an injunction are not different from the practice attributed to complainant, of utilizing defendant's news published by its subscribers. At this point it becomes necessary to consider a distinction that is drawn by complainant, and, as we understand it, was recognized by defendant also in the submission of proofs in the District Court, between two kinds of use that may be made by one news agency of news taken from the

bulletins and newspapers of the other.   The first is the bodily appropriation of a statement of fact or a news article, with or without rewriting, but without independent investigation or other expense.   This form of pirating was found by both courts to have been pursued by defendant systematically with respect to complainant's news, and against it the Circuit Court of Appeals granted an injunction.   This practice complainant denies having pursued, and the denial was sustained by the finding of the District Court.   It is not contended by defendant that the finding can be set aside, upon the proofs as they now stand.   The other use is to take the news of a rival agency as a "tip" to be investigated, and if verified by independent investigation the news thus gathered is sold. This practice complainant admits that it has pursued and still is willing that defendant shall employ.

Both courts held that complainant could not be debarred on the ground of unclean hands upon the score of pirating defendant's news, because not shown to be guilty of sanctioning this practice.

As to securing "tips" from a competing news agency, the District Court (240 Fed. Rep. 991, 995), while not sanctioning the practice, found that both parties had adopted it in accordance with common business usage, in the belief that their conduct was technically lawful, and hence did not find in it any sufficient ground for attributing unclean hands to complainant.   The Circuit Court of Appeals (245 Fed. Rep. 247) found that the tip habit, though discouraged by complainant, was "incurably journalistic," and that there was "no difficulty in discriminating between the utilization of 'tips' and the bodily appropriation of another's labor in accumulating and stating information."

We are inclined to think a distinction may be drawn between the utilization of tips and the bodily appropriation of news matter, either in its original form or after

rewriting and without independent investigation and verification; whatever may appear at the final hearing, the proofs as they now stand recognize such a distinction; both parties avowedly recognize the practice of taking tips, and neither party alleges it to be unlawful or to amount to unfair competition in business. In a line of English cases a somewhat analogous practice has been held not to amount to an infringement of the copyright of a directory or other book containing compiled information. In *Kelly* v. *Morris*, L. R. 1 Eq. 697, 701, 702, Vice Chancellor Sir William Page Wood (afterwards Lord Hatherly), dealing with such a case, said that defendant was "not entitled to take one word of the information previously published without independently working out the matter for himself, so as to arrive at the same result from the same common sources of information, and the only use that he can legitimately make of a previous publication is to verify his own calculations and results when obtained." This was followed by Vice Chancellor Giffard in *Morris* v. *Ashbee*, L. R. 7 Eq. 34, where he said: "In a case such as this no one has a right to take the results of the labour and expense incurred by another for the purposes of a rival publication, and thereby save himself the expense and labour of working out and arriving at these results by some independent road." A similar view was adopted by Lord Chancellor Hatherly and the former Vice Chancellor, then Giffard, L. J., in *Pike* v. *Nicholas*, L. R. 5 Ch. App. Cas. 251, and shortly afterwards by the latter judge in *Morris* v. *Wright*, L. R. 5 Ch. App. Cas. 279, 287, where he said, commenting upon *Pike* v. *Nicholas:* "It was a perfectly legitimate course for the defendant to refer to the plaintiff's book, and if, taking that book as his guide, he went to the original authorities and compiled his book from them, he made no unfair or improper use of the plaintiff's book; and so here, if the fact be that Mr. Wright used the plaintiff's

book in order to guide himself to the persons on whom it would be worth his while to call, and for no other purpose, he made a perfectly legitimate use of the plaintiff's book."

A like distinction was recognized by the Circuit Court of Appeals for the Second Circuit in *Edward Thompson Co.* v. *American Law Book Co.*, 122 Fed. Rep. 922, and in *West Publishing Co.* v. *Edward Thompson Co.*, 176 Fed. Rep. 833, 838.

In the case before us, in the present state of the pleadings and proofs, we need go no further than to hold, as we do, that the admitted pursuit by complainant of the practice of taking news items published by defendant's subscribers as tips to be investigated, and, if verified, the result of the investigation to be sold—the practice having been followed by defendant also, and by news agencies generally—is not shown to be such as to constitute an unconscientious or inequitable attitude towards its adversary so as to fix upon complainant the taint of unclean hands, and debar it on this ground from the relief to which it is otherwise entitled.

There is some criticism of the injunction that was directed by the District Court upon the going down of the mandate from the Circuit Court of Appeals.   In brief, it restrains any taking or gainfully using of the complainant's news, either bodily or in substance, from bulletins issued by the complainant or any of its members, or from editions of their newspapers, *"until its commercial value as news to the complainant and all of its members has passed away."*   The part complained of is the clause we have italicized; but if this be indefinite, it is no more so than the criticism.   Perhaps it would be better that the terms of the injunction be made specific, and so framed as to confine the restraint to an extent consistent with the reasonable protection of complainant's newspapers, each in its own area and for a specified time after its

publication, against the competitive use of pirated news by defendant's customers. But the case presents practical difficulties; and we have not the materials, either in the way of a definite suggestion of amendment, or in the way of proofs, upon which to frame a specific injunction; hence, while not expressing approval of the form adopted by the District Court, we decline to modify it at this preliminary stage of the case, and will leave that court to deal with the matter upon appropriate application made to it for the purpose.

The decree of the Circuit Court of Appeals will be

*Affirmed.*

MR. JUSTICE CLARKE took no part in the consideration or decision of this case.

MR. JUSTICE HOLMES:

When an uncopyrighted combination of words is published there is no general right to forbid other people repeating them—in other words there is no property in the combination or in the thoughts or facts that the words express. Property, a creation of law, does not arise from value, although exchangeable—a matter of fact. Many exchangeable values may be destroyed intentionally without compensation. Property depends upon exclusion by law from interference, and a person is not excluded from using any combination of words merely because someone has used it before, even if it took labor and genius to make it. If a given person is to be prohibited from making the use of words that his neighbors are free to make some other ground must be found. One such ground is vaguely expressed in the phrase unfair trade. This means that the words are repeated by a competitor in business in such a way as to convey a misrepresentation that materially injures the person who first used them, by appropriating credit of some kind

which the first user has earned.  The ordinary case is a
representation by device, appearance, or other indirection
that the defendant's goods come from the plaintiff.  But
the only reason why it is actionable to make such a repre-
sentation is that it tends to give the defendant an ad-
vantage in his competition with the plaintiff and that it
is thought undesirable that an advantage should be
gained in that way.  Apart from that the defendant may
use such unpatented devices and uncopyrighted com-
binations of words as he likes.  The ordinary case, I say,
is palming off the defendant's product as the plaintiff's,
but the same evil may follow from the opposite false-
hood—from saying, whether in words or by implication,
that the plaintiff's product is the defendant's, and that,
it seems to me, is what has happened here.

Fresh news is got only by enterprise and expense.  To
produce such news as it is produced by the defendant
represents by implication that it has been acquired by
the defendant's enterprise and at its expense.  When it
comes from one of the great news-collecting agencies like
the Associated Press, the source generally is indicated,
plainly importing that credit; and that such a representa-
tion is implied may be inferred with some confidence
from the unwillingness of the defendant to give the credit
and tell the truth.  If the plaintiff produces the news at
the same time that the defendant does, the defendant's
presentation impliedly denies to the plaintiff the credit
of collecting the facts and assumes that credit to the
defendant.  If the plaintiff is later in western cities it
naturally will be supposed to have obtained its informa-
tion from the defendant.  The falsehood is a little more
subtle, the injury a little more indirect, than in ordinary
cases of unfair trade, but I think that the principle that
condemns the one condemns the other.  It is a question
of how strong an infusion of fraud is necessary to turn
a flavor into a poison.  The dose seems to me strong

enough here to need a remedy from the law. But as, in my view, the only ground of complaint that can be recognized without legislation is the implied misstatement, it can be corrected by stating the truth; and a suitable acknowledgment of the source is all that the plaintiff can require. I think that within the limits recognized by the decision of the Court the defendant should be enjoined from publishing news obtained from the Associated Press for          hours after publication by the plaintiff unless it gives express credit to the Associated Press; the number of hours and the form of acknowledgment to be settled by the District Court.

MR. JUSTICE McKENNA concurs in this opinion.

MR. JUSTICE BRANDEIS dissenting.

There are published in the United States about 2,500 daily papers.[1] More than 800 of them are supplied with domestic and foreign news of general interest by the Associated Press—a corporation without capital stock which does not sell news or earn or seek to earn profits, but serves merely as an instrumentality by means of which these papers supply themselves at joint expense with such news. Papers not members of the Associated Press depend for their news of general interest largely upon agencies organized for profit.[2] Among these agen-

---

[1] See American Newspaper Annual and Directory (1918), pp. 4, 10, 1193–1212.

[2] The Associated Press, by Frank B. Noyes, Sen. Doc. No. 27, 63d Cong., 1st sess. In a brief filed in this court by counsel for the Associated Press the number of its members is stated to be 1030. Some members of the Associated Press are also subscribers to the International News Service.

Strictly the member is not the publishing concern, but an individual who is the sole or part owner of a newspaper, or an executive officer of a company which owns one. By-laws, Article II, § 1.

cies is the International News Service which supplies news to about 400 subscribing papers. It has, like the Associated Press, bureaus and correspondents in this and foreign countries; and its annual expenditure in gathering and distributing news is about $2,000,000. Ever since its organization in 1909, it has included among the sources from which it gathers news, copies (purchased in the open market) of early editions of some papers published by members of the Associated Press and the bulletins publicly posted by them. These items, which constitute but a small part of the news transmitted to its subscribers, are generally verified by the International News Service before transmission; but frequently items are transmitted without verification; and occasionally even without being re-written. In no case is the fact disclosed that such item was suggested by or taken from a paper or bulletin published by an Associated Press member.

No question of statutory copyright is involved. The sole question for our consideration is this: Was the International News Service properly enjoined from using, or causing to be used gainfully, news of which it acquired knowledge by lawful means (namely, by reading publicly posted bulletins or papers purchased by it in the open market) merely because the news had been originally gathered by the Associated Press and continued to be of value to some of its members, or because it did not reveal the source from which it was acquired?

The "ticker" cases, the cases concerning literary and artistic compositions, and cases of unfair competition were relied upon in support of the injunction. But it is admitted that none of those cases affords a complete analogy with that before us. The question presented for decision is new; and it is important.

News is a report of recent occurrences. The business of the news agency is to gather systematically knowledge

of such occurrences of interest and to distribute reports thereof. The Associated Press contended that knowledge so acquired is property, because it costs money and labor to produce and because it has value for which those who have it not are ready to pay; that it remains property and is entitled to protection as long as it has commercial value as news; and that to protect it effectively the defendant must be enjoined from making, or causing to be made, any gainful use of it while it retains such value. An essential element of individual property is the legal right to exclude others from enjoying it. If the property is private, the right of exclusion may be absolute; if the property is affected with a public interest, the right of exclusion is qualified. But the fact that a product of the mind has cost its producer money and labor, and has a value for which others are willing to pay, is not sufficient to ensure to it this legal attribute of property. The general rule of law is, that the noblest of human productions—knowledge, truths ascertained, conceptions, and ideas—become, after voluntary communication to others, free as the air to common use. Upon these incorporeal productions the attribute of property is continued after such communication only in certain classes of cases where public policy has seemed to demand it. These exceptions are confined to productions which, in some degree, involve creation, invention, or discovery. But by no means all such are endowed with this attribute of property. The creations which are recognized as property by the common law are literary, dramatic, musical, and other artistic creations; and these have also protection under the copyright statutes. The inventions and discoveries upon which this attribute of property is conferred only by statute, are the few comprised within the patent law. There are also many other cases in which courts interfere to prevent curtailment of plaintiff's enjoyment of incorporeal productions; and in which the

right to relief is often called a property right, but is such only in a special sense.  In those cases, the plaintiff has no absolute right to the protection of his production; he has merely the qualified right to be protected as against the defendant's acts, because of the special relation in which the latter stands or the wrongful method or means employed in acquiring the knowledge or the manner in which it is used.  Protection of this character is afforded where the suit is based upon breach of contract or of trust or upon unfair competition.

The knowledge for which protection is sought in the case at bar is not of a kind upon which the law has heretofore conferred the attributes of property; nor is the manner of its acquisition or use nor the purpose to which it is applied, such as has heretofore been recognized as entitling a plaintiff to relief.

*First:*  Plaintiff's principal reliance was upon the "ticker" cases; but they do not support its contention. The leading cases on this subject rest the grant of relief, not upon the existence of a general property right in news, but upon the breach of a contract or trust concerning the use of news communicated; and that element is lacking here.  In *Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236, 250, the court said the Board "does not lose its rights by communicating the result [the quotations] to persons, even if many, in confidential relations to itself, under a contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of trust and using knowledge obtained by such a breach."  And it is also stated there, (page 251): "Time is of the essence in matters like this, and it fairly may be said that, if the contracts with the plaintiff are kept, the information will not become public property until the plaintiff has gained its reward."  The only other case in this court which relates to this subject is *Hunt* v. *N. Y. Cotton Exchange,* 205 U. S.

322.   While the opinion there refers the protection to a general property right in the quotations, the facts are substantially the same as those in the *Christie Case*, which is the chief authority on which the decision is based.   Of the cases in the lower federal courts and in the state courts it may be said, that most of them too can, on their facts, be reconciled with this principle, though much of the language of the courts cannot be.[1]   In spite of anything that may appear in these cases to the contrary it seems that the true principle is stated in the *Christie Case*, that the collection of quotations "stands like a trade secret."   And in *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373, 402, this court says of a trade secret: "Any one may use it who fairly, by analysis and experiment, discovers it.   But the complainant is entitled to be protected against invasion of its right in the process by fraud or by breach of trust or contract."   See *John D. Park & Sons Co.* v. *Hartman*, 153 Fed. Rep. 24, 29.

The leading English case, *Exchange Telegraph Co.* v. *Gregory & Co.*, [1896] 1 Q. B. 147, is also rested clearly upon a breach of contract or trust, although there is some

---

[1] *Board of Trade of City of Chicago* v. *Tucker*, 221 Fed. Rep. 305; *Board of Trade of City of Chicago* v. *Price*, 213 Fed. Rep. 336; *McDearmott Commission Co.* v. *Board of Trade of City of Chicago*, 146 Fed. Rep. 961; *Board of Trade of City of Chicago* v. *Cella Commission Co.*, 145 Fed. Rep. 28; *National Tel. News Co.* v. *Western Union Tel. Co.*, 119 Fed. Rep. 294; *Illinois Commission Co.* v. *Cleveland Tel. Co.*, 119 Fed. Rep. 301; *Board of Trade of Chicago* v. *Hadden-Krull Co.*, 109 Fed. Rep. 705; *Cleveland Tel. Co.* v. *Stone*, 105 Fed. Rep. 794; *Board of Trade of City of Chicago* v. *Thomson Commission Co.*, 103 Fed. Rep. 902; *Kiernan* v. *Manhattan Quotation Telegraph Co.*, 50 How. Pr. 194.   The bill in *F. W. Dodge Co.* v. *Construction Information Co.*, 183 Mass. 62, was expressly based on breach of contract or of trust.   It has been suggested that a board of trade has a right of property in its quotations because the facts reported originated in its exchange.   The point has been mentioned several times in the cases, but no great importance seems to have been attached to it.

reference to a general property right. The later English cases seem to have rightly understood the basis of the decision, and they have not sought to extend it further than was intended. Indeed, we find the positive suggestion in some cases that the only ground for relief is the manner in which knowledge of the report of the news was acquired.[1]

If the news involved in the case at bar had been posted in violation of any agreement between the Associated Press and its members, questions similar to those in the "ticker" cases might have arisen. But the plaintiff does not contend that the posting was wrongful or that any papers were wrongfully issued by its subscribers. On the contrary it is conceded that both the bulletins and the papers were issued in accordance with the regulations of the plaintiff. Under such circumstances, for a reader of the papers purchased in the open market, or a reader of the bulletins publicly posted, to procure and use gainfully, information therein contained, does not involve inducing anyone to commit a breach either of contract or of trust, or committing or in any way abetting a breach of confidence.

*Second:* Plaintiff also relied upon the cases which hold that the common-law right of the producer to prohibit copying is not lost by the private circulation of a literary composition, the delivery of a lecture, the exhi-

---

[1] In *Exchange Telegraph Co., Ltd.,* v. *Howard,* 22 Times Law Rep. 375, 377, it is intimated that it would be perfectly permissible for the defendant to take the score from a newspaper supplied by the plaintiff and publish it. And it is suggested in *Exchange Telegraph Co., Ltd.,* v. *Central News, Ltd.,* [1897] 2 Ch. 48, 54, that there are sources from which the defendant might be able to get the information collected by the plaintiff and publish it without committing any wrong. Copinger, Law of Copyright, 5th ed., p. 35, explains the *Gregory Case* on the basis of the breach of confidence involved. Richardson, Law of Copyright, p. 39, also inclines to put the case "on the footing of implied confidence."

bition of a painting, or the performance of a dramatic or musical composition.[1]  These cases rest upon the ground that the common law recognizes such productions as property which, despite restricted communication, continues until there is a dedication to the public under the copyright statutes or otherwise.  But they are inapplicable for two reasons.  (1) At common law, as under the copyright acts, intellectual productions are entitled to such protection only if there is underneath something evincing the mind of a creator or originator, however modest the requirement.  The mere record of isolated happenings, whether in words or by photographs not involving artistic skill, are denied such protection.[2]  (2) At common law, as under the copyright acts, the element in intellectual productions which secures such protection is not the knowledge, truths, ideas, or emotions which the composition expresses, but the form or sequence in which they are expressed; that is, "some new collocation of visible or audible points,—of lines, colors, sounds, or

---

[1] *Ferris* v. *Frohman*, 223 U. S. 424; *American Tobacco Co.* v. *Werckmeister*, 207 U. S. 284, 299; *Universal Film Mfg. Co.* v. *Copperman*, 218 Fed. Rep. 577; *Werckmeister* v. *American Lithographic Co.*, 134 Fed. Rep. 321; *Drummond* v. *Altemus*, 60 Fed. Rep. 338; *Boucicault* v. *Hart*, 13 Blatchf. 47; Fed. Cas. No. 1692; *Crowe* v. *Aiken*, 2 Biss. 208; Fed. Cas. No. 3441; *Boucicault* v. *Fox*, 5 Blatchf. 87; Fed. Cas. No. 1691; *Bartlett* v. *Crittenden*, 5 McLean, 32; Fed. Cas. No. 1076; *Bartlette* v. *Crittenden*, 4 McLean, 300; Fed. Cas. No. 1082; *Tompkins* v. *Halleck*, 133 Mass. 32; *Aronson* v. *Baker*, 43 N. J. Eq. 365; *Caird* v. *Sime*, L. R. 12 App. Cas. 326; *Nicols* v. *Pitman*, L. R. 26 Ch. D. 374; *Abernethy* v. *Hutchinson*, 3 L. J. (O. S.) Ch. 209; *Turner* v. *Robinson*, 10 Ir. Eq. Rep. 121.

[2] Compare *Bleistein* v. *Donaldson Lithographing Co.*, 188 U. S. 239, 250; *Higgins* v. *Keuffel*, 140 U. S. 428, 432; *Burrow-Giles Lithographic Co.* v. *Sarony*, 111 U. S. 53, 58–60; *Baker* v. *Selden*, 101 U. S. 99, 105, 106; *Clayton* v. *Stone*, 2 Paine, 382; Fed. Cas. No. 2872; *National Tel. News Co.* v. *Western Union Tel. Co.*, 119 Fed. Rep. 294, 296–298; *Banks Law Pub. Co.* v. *Lawyers' Co-operative Pub. Co.*, 169 Fed. Rep. 386, 391.

words." See *White-Smith Music Co.* v. *Apollo Co.*, 209 U. S. 1, 19; *Kalem Co.* v. *Harper Brothers*, 222 U. S. 55, 63. An author's theories, suggestions, and speculations, or the systems, plans, methods, and arrangements of an originator, derive no such protection from the statutory copyright of the book in which they are set forth; [1] and they are likewise denied such protection at common law. [2]

That news is not property in the strict sense is illustrated by the case of *Sports and General Press Agency, Ltd.,* v. *"Our Dogs" Publishing Co., Ltd.*, [1916] 2 K. B. 880, where the plaintiff, the assignee of the right to photograph the exhibits at a dog show, was refused an injunction against defendant who had also taken pictures of the show and was publishing them. The court said that, except in so far as the possession of the land occupied by the show enabled the proprietors to exclude people or permit them on condition that they agree not to take photographs (which condition was not imposed in that case), the proprietors had no exclusive right to photograph the show and could therefore grant no such right. And, it was further stated that, at any rate, no matter what conditions might be imposed upon those entering the grounds, if the defendant had been on top of a house or in some position where he could photograph the show without interfering with the physical property of the plaintiff, the plaintiff would have no right to stop him. If, when the plaintiff creates the event recorded, he is not entitled to the exclusive first publication of the

---

[1] *Baker* v. *Selden*, 101 U. S. 99; *Perris* v. *Hexamer*, 99 U. S. 674; *Barnes* v. *Miner*, 122 Fed. Rep. 480, 491; *Burnell* v. *Chown*, 69 Fed. Rep. 993; *Tate* v. *Fullbrook*, [1908] 1 K. B. 821; *Chilton* v. *Progress Printing & Publishing Co.*, [1895] 2 Ch. 29, 34; *Kendrick & Co.* v. *Lawrence & Co.*, L. R. 25 Q. B. D. 99; *Pike* v. *Nicholas*, L. R. 5 Ch. App. 251.

[2] *Bristol* v. *Equitable Life Assurance Society*, 132 N. Y. 264; *Haskins* v. *Ryan*, 71 N. J. Eq. 575.

news (in that case a photograph) of the event, no reason can be shown why he should be accorded such protection as to events which he simply records and transmits to other parts of the world, though with great expenditure of time and money.

*Third:* If news be treated as possessing the characteristics not of a trade secret, but of literary property, then the earliest issue of a paper of general circulation or the earliest public posting of a bulletin which embodies such news would, under the established rules governing literary property, operate as a publication, and all property in the news would then cease. Resisting this conclusion, plaintiff relied upon the cases which hold that uncopyrighted intellectual and artistic property survives private circulation or a restricted publication; and it contended that in each issue of each paper, a restriction is to be implied that the news shall not be used gainfully in competition with the Associated Press or any of its members. There is no basis for such an implication. But it is also well settled that where the publication is in fact a general one, even express words of restriction upon use are inoperative. In other words, a general publication is effective to dedicate literary property to the public, regardless of the actual intent of its owner.[1] In the cases dealing with lectures, dramatic and musical performances, and art exhibitions,[2] upon which plaintiff relied, there was no general publication in print comparable to the issue of daily newspapers or the unrestricted public posting of bulletins. The principles governing those cases differ more or less in application, if not in theory, from the principles governing the issue of printed copies;

---

[1] *Jewelers' Mercantile Agency* v. *Jewelers' Publishing Co.*, 155 N. Y. 241; *Wagner* v. *Conried*, 125 Fed. Rep. 798, 801; *Larrowe-Loisette* v. *O'Loughlin*, 88 Fed. Rep. 896.

[2] See cases in note 1, p. 254, *supra;* Richardson, Law of Copyright, p. 128.

and in so far as they do differ, they have no application to the case at bar.

*Fourth:* Plaintiff further contended that defendant's practice constitutes unfair competition, because there is "appropriation without cost to itself of values created by." the plaintiff; and it is upon this ground that the decision of this court appears to be based. To appropriate and use for profit, knowledge and ideas produced by other men, without making compensation or even acknowledgment, may be inconsistent with a finer sense of propriety; but, with the exceptions indicated above, the law has heretofore sanctioned the practice. Thus it was held that one may ordinarily make and sell anything in any form, may copy with exactness that which another has produced, or may otherwise use his ideas without his consent and without the payment of compensation, and yet not inflict a legal injury; [1] and that ordinarily one is at perfect liberty to find out, if he can by lawful means, trade secrets of another, however valuable, and then use the knowledge so acquired gainfully, although it cost the original owner much in effort and in money to collect or produce. [2]

---

[1] *Flagg Manufacturing Co.* v. *Holway*, 178 Massachusetts, 83; *Bristol* v. *Equitable Life Assurance Society*, 132 N. Y. 264; *Keystone Type Foundry* v. *Portland Publishing Co.*, 186 Fed. Rep. 690.

[2] *Chadwick* v. *Covell*, 151 Massachusetts, 190; *Tabor* v. *Hoffman*, 118 N. Y. 30, 36; *James* v. *James*, L. R. 13 Eq. 421. Even when knowledge is compiled, as in a dictionary, and copyrighted, the suggestions and sources therein may be freely used by a later compiler. The copyright protection merely prevents his taking the ultimate data while avoiding the labor and expense involved in compiling them. *Pike* v. *Nicholas*, L. R. 5 Ch. App. 251; *Morris* v. *Wright*, L. R. 5 Ch. App. 279; *Edward Thompson Co.* v. *American Law Book Co.*, 122 Fed. Rep. 922; *West Pub. Co.* v. *Edward Thompson Co.*, 176 Fed. Rep. 833. It is assumed that in the absence of copyright, the data compiled could be freely used. See *Morris* v. *Ashbee*, L. R. 7 Eq. 34, 40. Compare also *Chilton* v. *Progress Printing & Publishing Co.*, [1895] 2 Ch. 29.

Such taking and gainful use of a product of another which, for reasons of public policy, the law has refused to endow with the attributes of property, does not become unlawful because the product happens to have been taken from a rival and is used in competition with him. The unfairness in competition which hitherto has been recognized by the law as a basis for relief, lay in the manner or means of conducting the business; and the manner or means held legally unfair, involves either fraud or force or the doing of acts otherwise prohibited by law. In the "passing off" cases (the typical and most common case of unfair competition), the wrong consists in fraudulently representing by word or act that defendant's goods are those of plaintiff. See *Hanover Milling Co.* v. *Metcalf*, 240 U. S. 403, 412–413. In the other cases, the diversion of trade was effected through physical or moral coercion, or by inducing breaches of contract or of trust or by enticing away employees. In some others, called cases of simulated competition, relief was granted because defendant's purpose was unlawful; namely, not competition but deliberate and wanton destruction of plaintiff's business.[1]

---

[1] "Trust Laws & Unfair Competition" (U. S. Bureau of Corporations, March 15, 1915), pp. 301–331, 332–461; Nims, Unfair Competition & Trade-Marks, c. XIX; *Sperry & Hutchinson Co.* v. *Pommer*, 199 Fed. Rep. 309, 314; *Racine Paper Goods Co.* v. *Dittgen*, 171 Fed. Rep. 631; *Schönwald* v. *Ragains*, 32 Oklahoma, 223; *Attorney General* v. *National Cash Register Co.*, 182 Michigan, 99; *Witkop & Holmes Co.* v. *Great Atlantic & Pacific Tea Co.*, 124 N. Y. Supp. 956, 958; *Dunshee* v. *Standard Oil Co.*, 152 Iowa, 618; *Tuttle* v. *Buck*, 107 Minnesota, 145.

The cases of *Fonotipia, Limited*, v. *Bradley*, 171 Fed. Rep. 951, and *Prest-O-Lite Co.* v. *Davis*, 209 Fed. Rep. 917, which were strongly relied upon by the plaintiff, contain expressions indicating rights possibly broad enough to sustain the injunction in the case at bar; but both cases involve elements of "passing off." See also *Prest-O-Lite Co.* v. *Davis*, 215 Fed. Rep. 349; *Searchlight Gas Co.* v. *Prest-O-Lite Co.*, 215 Fed. Rep. 692; *Prest-O-Lite Co.* v. *H. W. Bogen, Inc.*, 209

215.                    BRANDEIS, J., dissenting.

That competition is not unfair in a legal sense, merely because the profits gained are unearned, even if made at the expense of a rival, is shown by many cases besides those referred to above. He who follows the pioneer into a new market, or who engages in the manufacture of an article newly introduced by another, seeks profits due largely to the labor and expense of the first adventurer; but the law sanctions, indeed encourages, the pursuit.[1] He who makes a city known through his product, must submit to sharing the resultant trade with others who, perhaps for that reason, locate there later. *Canal Co.* v. *Clark*, 13 Wall. 311; *Elgin National Watch Co.* v. *Illinois Watch Co.*, 179 U. S. 665, 673. He who has made his name a guaranty of quality, protests in vain when another with the same name engages, perhaps for that reason, in the same lines of business; provided, precaution is taken to prevent the public from being deceived into the belief that what he is selling was made by his competitor. One bearing a name made famous by another is permitted to enjoy the unearned benefit which necessarily flows from such use, even though the use proves harmful to him who gave the name value. *Brown Chemical Co.* v. *Meyer*, 139 U. S. 540, 544; *Howe Scale Co.* v. *Wyckoff, Seamans & Benedict*, 198 U. S. 118; *Donnell* v. *Herring-Hall-Marvin Safe Co.*, 208 U. S. 267; *Waterman Co.* v. *Modern Pen Co.*, 235 U. S. 88. See *Saxlehner* v. *Wagner*, 216 U. S. 375.

The means by which the International News Service obtains news gathered by the Associated Press is also clearly unobjectionable. It is taken from papers bought in the open market or from bulletins publicly posted.

Fed. Rep. 915; *Prest-O-Lite Co.* v. *Avery Lighting Co.*, 161 Fed. Rep. 648. In *Prest-O-Lite Co.* v. *Auto Acetylene Light Co.*, 191 Fed. Rep. 90, the bill was dismissed on the ground that no deception was shown.

[1] *Magee Furnace Co.* v. *Le Barron*, 127 Massachusetts, 115; *Ricker* v. *Railway*, 90 Maine, 395, 403.

No breach of contract such as the court considered to exist in *Hitchman Coal & Coke Co.* v *Mitchell*, 245 U. S. 229, 254; or of trust such as was present in *Morison* v. *Moat*, 9 Hare, 241; and neither fraud nor force, is involved. The manner of use is likewise unobjectionable. No reference is made by word or by act to the Associated Press, either in transmitting the news to subscribers or by them in publishing it in their papers. Neither the International News Service nor its subscribers is gaining or seeking to gain in its business a benefit from the reputation of the Associated Press. They are merely using its product without making compensation. See *Bamforth* v. *Douglass Post Card & Machine Co.*, 158 Fed. Rep. 355; *Tribune Co. of Chicago* v. *Associated Press*, 116 Fed. Rep. 126. That, they have a legal right to do; because the product is not property, and they do not stand in any relation to the Associated Press, either of contract or of trust, which otherwise precludes such use. The argument is not advanced by characterizing such taking and use a misappropriation.

It is also suggested, that the fact that defendant does not refer to the Associated Press as the source of the news may furnish a basis for the relief. But the defendant and its subscribers, unlike members of the Associated Press, were under no contractual obligation to disclose the source of the news; and there is no rule of law requiring acknowledgment to be made where uncopyrighted matter is reproduced. The International News Service is said to mislead its subscribers into believing that the news transmitted was originally gathered by it and that they in turn mislead their readers. There is, in fact, no representation by either of any kind. Sources of information are sometimes given because required by contract; sometimes because naming the source gives authority to an otherwise incredible statement; and sometimes the source is named because the agency does not wish to take the

responsibility itself of giving currency to the news.   But no representation can properly be implied from omission to mention the source of information except that the International News Service is transmitting news which it believes to be credible.

Nor is the use made by the International News Service of the information taken from papers or bulletins of Associated Press members legally objectionable by reason of the purpose for which it was employed.   The acts here complained of were not done for the purpose of injuring the business of the Associated Press.   Their purpose was not even to divert its trade, or to put it at a disadvantage by lessening defendant's necessary expenses.   The purpose was merely to supply subscribers of the International News Service promptly with all available news. The suit is, as this court declares, in substance one brought for the benefit of the members of the Associated Press, who would be proper, and except for their number perhaps necessary, parties; and the plaintiff conducts the suit as representing their interest.   It thus appears that the protection given by the injunction is not actually to the business of the complainant news agency; for this agency does not sell news nor seek to earn profits, but is a mere instrumentality by which 800 or more newspapers collect and distribute news.   It is these papers severally which are protected; and the protection afforded is not from competition of the defendant, but from possible competition of one or more of the 400 other papers which receive the defendant's service.   Furthermore, the protection to these Associated Press members consists merely in denying to other papers the right to use, as news, information which, by authority of all concerned, had theretofore been given to the public by some of those who joined in gathering it; and to which the law denies the attributes of property.   There is in defendant's purpose nothing on which to base a claim for relief.

It is further said that, while that for which the Associated Press spends its money is too fugitive to be recognized as property in the common-law courts, the defendant cannot be heard to say so in a court of equity, where the question is one of unfair competition. The case presents no elements of equitable title or of breach of trust. The only possible reason for resort to a court of equity in a case like this is that the remedy which the law gives is inadequate. If the plaintiff has no legal cause of action, the suit necessarily fails. *Levy* v. *Walker*, L. R. 10 Ch. D. 436, 449. There is nothing in the situation of the parties which can estop the defendant from saying so.

*Fifth:* The great development of agencies now furnishing country-wide distribution of news, the vastness of our territory, and improvements in the means of transmitting intelligence, have made it possible for a news agency or newspapers to obtain, without paying compensation, the fruit of another's efforts and to use news so obtained gainfully in competition with the original collector. The injustice of such action is obvious. But to give relief against it would involve more than the application of existing rules of law to new facts. It would require the making of a new rule in analogy to existing ones. The unwritten law possesses capacity for growth; and has often satisfied new demands for justice by invoking analogies or by expanding a rule or principle. This process has been in the main wisely applied and should not be discontinued. Where the problem is relatively simple, as it is apt to be when private interests only are involved, it generally proves adequate. But with the increasing complexity of society, the public interest tends to become omnipresent; and the problems presented by new demands for justice cease to be simple. Then the creation or recognition by courts of a new private right may work serious injury to the general public, unless the

boundaries of the right are definitely established and wisely guarded.   In order to reconcile the new private right with the public interest, it may be necessary to prescribe limitations and rules for its enjoyment; and also to provide administrative machinery for enforcing the rules.   It is largely for this reason that, in the effort to meet the many new demands for justice incident to a rapidly changing civilization, resort to legislation has latterly been had with increasing frequency.

The rule for which the plaintiff contends would effect an important extension of property rights and a corresponding curtailment of the free use of knowledge and of ideas; and the facts of this case admonish us of the danger involved in recognizing such a property right in news, without imposing upon news-gatherers corresponding obligations.   A large majority of the newspapers and perhaps half the newspaper readers of the United States are dependent for their news of general interest upon agencies other than the Associated Press.   The channel through which about 400 of these papers received, as the plaintiff alleges, "a large amount of news relating to the European war of the greatest importance and of intense interest to the newspaper reading public" was suddenly closed.   The closing to the International News Service of these channels for foreign news (if they were closed) was due not to unwillingness on its part to pay the cost of collecting the news, but to the prohibitions imposed by foreign governments upon its securing news from their respective countries and from using cable or telegraph lines running therefrom.   For aught that appears, this prohibition may have been wholly undeserved; and at all events the 400 papers and their readers may be assumed to have been innocent.   For aught that appears, the International News Service may have sought then to secure temporarily by arrangement with the Associated Press the latter's foreign news service.   For aught that

appears, all of the 400 subscribers of the International News Service would gladly have then become members of the Associated Press, if they could have secured election thereto.[1] It is possible, also, that a large part of the readers of these papers were so situated that they could not secure prompt access to papers served by the Associated Press. The prohibition of the foreign governments might as well have been extended to the channels through which news was supplied to the more than a thousand other daily papers in the United States not served by the Associated Press; and a large part of their readers may also be so located that they can not procure prompt access to papers served by the Associated Press.

A legislature, urged to enact a law by which one news agency or newspaper may prevent appropriation of the fruits of its labors by another, would consider such facts and possibilities and others which appropriate enquiry might disclose. Legislators might conclude that it was impossible to put an end to the obvious injustice involved in such appropriation of news, without opening the door to other evils, greater than that sought to be remedied. Such appears to have been the opinion of our Senate which reported unfavorably a bill to give news a few

---

[1] According to the by-laws of the Associated Press no one can be elected a member without the affirmative vote of at least four-fifths of all the members of the corporation or the vote of the directors. Furthermore, the power of the directors to admit anyone to membership may be limited by a right of protest to be conferred upon individual members. See By-laws, Article III, § 6. "The members of this Corporation may, by an affirmative vote of seven-eighths of all the members, confer upon a member (with such limitations as may be at the time prescribed) a right of protest against the admission of new members by the Board of Directors. The right of protest, within the limits specified at the time it is conferred, shall empower the member holding it to demand a vote of the members of the Corporation on all applications for the admission of new members within the district for which it is conferred except as provided in Section 2 of this Article."

215.                    BRANDEIS, J., dissenting.

hours' protection; [1] and which ratified, on February 15, 1911, the convention adopted at the Fourth International American Conference; [2] and such was evidently the view also of the signatories to the International Copyright Union of November 13, 1908; [3] as both these conventions expressly exclude news from copyright protection.

---

[1] Senate Bill No. 1728, 48th Cong., 1st sess. The bill provides:

"That any daily or weekly newspaper, or any association of daily or weekly newspapers, published in the United States or any of the Territories thereof, shall have the sole right to print, issue, and sell, for the term of eight hours, dating from the hour of going to press, the contents of said daily or weekly newspaper, or the collected news of said newspaper association, exceeding one hundred words.

"Sec. 2. That for any infringement of the copyright granted by the first section of this act the party injured may sue in any court o competent jurisdiction and recover in any proper action the damages sustained by him from the person making such infringement, together with the costs of suit."

It was reported on April 18, 1884, by the Committee on the Library, without amendment, and that it ought not to pass. Journal of the Senate, 48th Cong., 1st sess., p. 548. No further action was apparently taken on the bill.

When the copyright legislation of 1909, finally enacted as Act of March 4, 1909, c. 320, 35 Stat. 1075, was under consideration, there was apparently no attempt to include news among the subjects of copyright. Arguments before the Committees on Patents of the Senate and House of Representatives on Senate Bill No. 6330 and H. R. Bill No. 19853, 59th Cong., 1st sess., June 6, 7, 8, and 9, and December 7, 8, 10, and 11, 1906; Hearings on Pending Bills to Amend and Consolidate Acts Respecting Copyright, March 26, 27 and 28, 1908.

[2] 38 Stat. 1785, 1789, Article 11.

[3] Bowker, Copyright: Its History and its Law, pp. 330, 612, 613. See the similar provisions in the Berne Convention (1886) and the Paris Convention (1896). *Id.*, pp. 612, 613.

In 1898 Lord Herschell introduced in Parliament a bill, § 11 of which provides: "Copyright in respect of a newspaper shall apply only to such parts of the newspaper as are compositions of an original literary character, to original illustrations therein, *and to such news and information as have beene specially and independently obtained.*"

Or legislators dealing with the subject might conclude, that the right to news values should be protected to the extent of permitting recovery of damages for any unauthorized use, but that protection by injunction should be denied, just as courts of equity ordinarily refuse (perhaps in the interest of free speech) to restrain actionable libels,[1] and for other reasons decline to protect by injunction mere political rights;[2] and as Congress has prohibited courts from enjoining the illegal assessment or collection of federal taxes.[3] If a legislature concluded to recognize property in published news to the extent of permitting recovery at law, it might, with a view to making the remedy more certain and adequate, provide a fixed measure of damages, as in the case of copyright infringement.[4]

Or again, a legislature might conclude that it was unwise to recognize even so limited a property right in published news as that above indicated; but that a news agency should, on some conditions, be given full protec-

---

(Italics ours.)   House of Lords, Sessional Papers, 1898, vol. 3, Bill No. 21.  Birrell, Copyright in Books, p. 210.  But the bill was not enacted, and in the English law as it now stands there is no provision giving even a limited copyright in news as such.  Act of December 16, 1911, 1 and 2 Geo. V, c. 46.

[1] *Boston Diatite Co.* v. *Florence Mfg. Co.*, 114 Massachusetts, 69; *Prudential Assurance Co.* v. *Knott*, L. R. 10 Ch. App. 142.

[2] *Giles* v. *Harris*, 189 U. S. 475.  Compare *Swafford* v. *Templeton*, 185 U. S. 487; *Green* v. *Mills*, 69 Fed. Rep. 852, 859.

[3] Revised Statutes, § 3224; *Snyder* v. *Marks*, 109 U. S. 189; *Dodge* v. *Osborn*, 240 U. S. 118.

[4] Act of March 4, 1909, § 25, c. 320, 35 Stat. 1075, 1081, provides as to the liability for the infringement of a copyright, that, "in the case of a newspaper reproduction of a copyrighted photograph such damages shall not exceed the sum of two hundred dollars nor be less than the sum of fifty dollars"; and that in the case of infringement of a copyrighted newspaper the damages recoverable shall be one dollar for every infringing copy, but shall not be less than $250 nor more than $5,000.

tion of its business; and to that end a remedy by injunction as well as one for damages should be granted, where news collected by it is gainfully used without permission. If a legislature concluded, (as at least one court has held, *New York & Chicago Grain & Stock Exchange* v. *Board of Trade*, 127 Illinois, 153) that under certain circumstances news-gathering is a business affected with a public interest, it might declare that, in such cases, news should be protected against appropriation, only if the gatherer assumed the obligation of supplying it, at reasonable rates and without discrimination, to all papers which applied therefor. If legislators reached that conclusion, they would probably go further, and prescribe the conditions under which and the extent to which the protection should be afforded; and they might also provide the administrative machinery necessary for ensuring to the public, the press, and the news agencies, full enjoyment of the rights so conferred.

Courts are ill-equipped to make the investigations which should precede a determination of the limitations which should be set upon any property right in news or of the circumstances under which news gathered by a private agency should be deemed affected with a public interest. Courts would be powerless to prescribe the detailed regulations essential to full enjoyment of the rights conferred or to introduce the machinery required for enforcement of such regulations. Considerations such as these should lead us to decline to establish a new rule of law in the effort to redress a newly-disclosed wrong, although the propriety of some remedy appears to be clear.